UNITED STATES of America,
Plaintiff,

v.

MURPHY OIL USA, INC., Defendant.

No. 00–C–0409–C.

United States District Court,
W.D. Wisconsin.

May 21, 2001.

As Amended May 25, 2001
and June 11, 2001.

Leslie K. Herje, Madison, WI, for U.S.

**1062**

John Koeppl, Dewitt, Ross & Stevens, Madison, WI, for Murphy Oil USA, Inc.

Mark A. Thimke, Foley & Lardner, Milwaukee, WI, for Wisconsin Manufacturers & Commer.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action brought by plaintiff United States of America against defendant Murphy Oil USA. Inc. to obtain injunctive relief and civil penalties for alleged past and present violations of environmental laws at defendant's petroleum refinery in Superior, Wisconsin. Plaintiff contends that defendant has violated and is continuing to violate the Clean Air Act, 42 U.S.C. §§ 7401–7671q, the Clean Water Act, 33 U.S.C. §§ 1251–1387. Subchapter III of the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6921–6939e, and the Emergency Planning and Community Right–to–Know Act, 42 U.S.C. §§ 6991–6991h. Jurisdiction is present. See 28 U.S.C. §§ 1331, 1345 and 1355; 42 U.S.C. § 7413(b); 33 U.S.C. § 1319(b); 42 U.S.C. §§ 6928(a) and (h) and 6991(e).

Some description of the laws alleged to have been violated will provide context for this comprehensive prosecution plaintiff has brought, in which it is alleging 24 separate violations against defendant and in which defendant has asserted eleven affirmative defenses, nine of them against the alleged Clean Air Act violations. The Clean Air Act assigns responsibility to both the state and federal governments for preventing and controlling air pollution. Congress has charged the Environmental Protection Agency with establishing national ambient air quality standards that protect human health and the environment. See 42·U.S.C. § 7409. Individual states have the opportunity to adopt statutes and regulations to achieve the federally established air quality standards within

their borders. See 42 U.S.C. §§ 7407 and 7410. Once approved by plaintiff, these state plans are referred to as "state implementation plans" and are enforceable by both the state and federal governments. See id.; see also 42 U.S.C. § 7413(a) and (b). Plaintiff has approved Wisconsin's implementation plan for regulating sulfur dioxide, the main air pollutant at issue in this case. As part of their preparation of implementation plans, states must designate those areas in their states in which air quality attains the standards set by the federal government. In those "attainment areas" states must implement and enforce a Prevention of Significant Deterioration program that prescribes a pre-construction review process for large stationary sources of air emissions. In Wisconsin, the Department of Natural Resources has had authority for this review process during all relevant times. The reviewing authority estimates the emissions for a proposed source to determine whether they will lead to a deterioration of the air quality within the attainment area beyond statutorily determined levels. Those sources that will produce such emissions must undergo Prevention of Significant Deterioration review that may require the utilization of best available control technology to control emissions from the proposed new or modified emission source. See 42 U.S.C. § 7475(a)(4).

In addition, the Clean Air Act prescribes uniform national standards known as New Source Performance Standards that establish technology-based minimum levels of performance with which certain types of new and modified sources must comply. See 42 U.S.C. § 7411. These standards apply to certain types of new emission sources and the modification of certain types of existing sources.

The Clean Water Act has as its goal the restoration and maintenance of the chemi-

cal, biological and physical integrity of the nation's waters. *See* 33 U.S.C. § 1251(a). It prohibits the discharge of any pollutant into the navigable waters of the United States except in compliance with a National Pollutant Discharge Elimination System permit issued by plaintiff. *See* 33 U.S.C. § 1342. The Wisconsin Department of Natural Resources administers the permit system within Wisconsin, pursuant to a 1974 memorandum of understanding that gave the state implementation and enforcement authority over the system. Under the Clean Water Act, effluent limitations control particular discharges. Generally, there are two types of limits, categorical limits and water based quality limits. In this case, only water based quality limits are at issue.

The Resource Conservation and Recovery Act addresses the problems posed by hazardous waste and attempts to reduce the threat to human health and the environment that such waste poses. The act takes what has been called a "cradle-to-grave" approach, regulating hazardous waste from its initial generation to its ultimate disposal. *See, e.g., United States v. Power Engineering Co.,* 10 F.Supp.2d 1145, 1147 (D.Colo.1998). Plaintiff has authorized the state of Wisconsin to administer and enforce a hazardous waste program. As a generator of hazardous waste, defendant is subject to the act.

The Emergency Planning and Community Right–to–Know Act was enacted as independent legislation within the Comprehensive Environmental Response Compensation and Liability Act. The act has two goals: providing local communities with information about potential chemical hazards within their boundaries and encouraging state and local emergency planning for response to spills or releases of toxic or hazardous chemicals. *See Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 86, 118 S.Ct. 1003, 140 L.Ed.2d 210

(1998). The act's reporting requirements compel users of specified toxic and hazardous chemicals to file annual forms describing such matters as the name and quantity of chemicals on hand, the waste-disposal method employed and the annual quantity released into each environmental medium. *See id.* at 86–87, 118 S.Ct. 1003; 42 U.S.C. §§ 11022 and 11023.

The case is before the court on plaintiff's motion for partial summary judgment on all claims as to liability and defendant's motion for partial summary judgment dismissing claims 1–5, 7, 8 and 14–21. I conclude that defendant's motion for partial summary judgment must be denied either because there are material facts in dispute that prevent resolution before trial or because the defenses fail as a matter of law. Central to the first four Clean Air Act claims is plaintiff's allegation that defendant withheld from regulators relevant information concerning its plans to improve its sulfur recovery unit and distillate unifier in 1988 and 1992. It remains unclear exactly what information was withheld, what the relevance of any such information might be and what significance any withheld information might have in light of the frequent inspections the Wisconsin Department of Natural Resources made of the refinery and the numerous discussions they had with defendant's employees before and during the construction period. Until these matters are resolved at trial, it is not possible to make a final determination of many of the defenses defendant has raised or the first four claims plaintiff has brought.

I conclude that plaintiff's motion for partial summary judgment must be denied as to claims one through five, ten, eleven, twelve and thirteen, twenty-two through twenty-four and that it will be granted as to claims six, seven, eight, nine, fourteen, seventeen and eighteen. A ruling will be

reserved on claim fifteen, a portion of which has been withdrawn by plaintiff. Claims sixteen, nineteen, twenty and twenty-one are withdrawn by plaintiff.

Before setting out the undisputed facts, a few words about the parties' submissions are in order. First, a party's proposed findings of fact are supposed to be facts. "Facts" refer to the historical events out of which the dispute arose. Facts are what happened, who did it, when it happened, who made what admissions or representations, what or whom was involved. It is not a "fact" that this court has subject matter jurisdiction over the case, pursuant to 28 U.S.C. § 1331 or any other statute. That is a conclusion of law. Similarly, it is not a fact that notice of the commencement of this action was given to the state of Wisconsin pursuant to 42 U.S.C. § 7412(b). That too is a legal conclusion. The fact or facts are what was done to effect such notice. Did plaintiff send the state a letter? If so, on what date was it sent and what did it say?

Counsel should not include excerpts from statutes in their proposed findings of fact; such excerpts are not facts but law and should be saved for discussion in the brief or proposed conclusions of law. Counsel should note that except in unusual circumstances, it is not a material fact that so-and-so testified to such-and-such in a deposition. For example, in a case involving an automobile accident it is not a material fact that John Smith testified in a deposition that the traffic light was green when he entered the intersection. The fact for the trier of fact (or the judge determining the existence or non-existence of disputed material facts) is whether the light was green, not what John Smith said about it. The correct way to propose the fact is, "The traffic light was green when John Smith entered the intersection. *See* April 2, 2001 deposition of John Smith at 27, ls. 11–22."

Second, it is not necessary to repeat all of the proposed facts in the brief. *See Procedures to be Followed on Motions for Summary Judgment* ¶ 5. If counsel include facts in a brief, they must take care not to rely on any fact that has not been made the subject of a proposed finding. Moreover, if counsel believe it necessary to refer to factual matters, they should cite the proposed finding of fact that supports the assertion of fact, rather than cite a declaration of an expert or a deposition of a witness. Citing a declaration or deposition implies to the factfinder that the factual matter is new and has not been properly proposed as a fact. Counsel should not expect the court to comb through more than 1700 proposed findings of fact and conclusions of law to determine whether a particular factual assertion has been proposed properly.

Third, it is definitely not necessary to propose the same fact more than once, even if it relates to more than one claim. Counsel's practice in this case, along with their unauthorized inclusion of extensive and irrelevant argument in their response to their opponent's proposed facts, has caused the record in this case to swell to unprecedented proportions.

Another word. When a party is asking a court to decide an issue involving scientific and bureaucratic terms that are unfamiliar to lay people, the party should use care to assist the court in understanding the terminology. Above all, it should not use acronyms without explaining what they stand for or employ terms whose meaning a court has no way of learning. (For example, plaintiff has never told the court what a "multimedia" inspection of an oil refinery might be. The Oxford English Dictionary says that "multimedia" designates or pertains to "a form of artistic, educational, or commercial communication in which more than one medium is used."

From the context in which plaintiff uses the word, I doubt that it meant to say that the Environmental Protection Agency representatives went to defendant's refinery to make a presentation using a number of forms of media.) Defendant's expert on opacity matters, Thomas Rose, used the term "seact" in a report; (neither the Oxford English Dictionary, Merriam–Webster online nor any specialized engineering dictionary recognizes this word.)

■ Finally, defendant has moved to strike plaintiff's untimely proposed findings of fact and conclusions of law in opposition to defendant's motion for summary judgment (dkt.# 123). The motion will be granted. The magistrate judge set a deadline of March 23, 2001, for the filing of such submissions, warning the parties that after two previous extensions of time, this deadline was firm. Despite the warning, plaintiff's filing was three days late. From the findings of fact proposed by the parties, I find that the following are material and not disputed.

## UNDISPUTED FACTS

### A. *Background*

Plaintiff is the United States of America, suing on behalf of the United States Environmental Protection Agency. (Future references to "plaintiff" in this opinion will be to the EPA.) Defendant Murphy Oil USA, Inc. is a Delaware corporation that has owned and operated a petroleum refinery in Superior, Wisconsin, since approximately 1950. The refinery is located about 1.5 miles from Lake Superior. It extends over 230 acres and can process an average annual crude capacity of somewhat less than 35,000 barrels a day.

Defendant's refinery uses many processes, including atmospheric distillation, hydrotreating, isomerization, fluidized catalytic cracking, alkylation, catalytic reforming, sulfur recovery and blending operations, among others. Defendant receives crude oil from Canada and North Dakota through the Lakehead Pipeline and refines it into several petroleum derivatives, including at least six types of crude oil with varying sulfur contents. Those with lower sulfur content are identified as sweet crudes; those with higher contents are known as sour crudes. Historically, about 45 to 50% of defendant's "feed stock" is converted into gasoline. The rest becomes diesel fuel, kerosene, light and heavy oil fuels, propane and butane gas, asphalt and elemental sulfur.

### B. *Clean Air Act Claims (1–6)*

#### 1. *Claims one to four; preconstruction activities*

a. Defendant's sulfur recovery unit

Defendant's sulfur recovery unit was built by another company for a gas plant. Defendant bought it and moved it to Superior, where it was reconstructed for defendant's use and installed in 1973. The unit uses a vapor-phase catalytic reaction of $SO_2$ and $H_2S$ to recover sulfur from $H_2S$, a highly toxic gas. The unit converts hydrogen sulfide, or $H_2S$, from the amine section acid gas and from the sour water stripper off-gas into elemental sulfur.

The capacity of the sulfur recovery unit to process gas streams is measured in long tons per day. The unit converts hydrogen sulfide into liquid elemental sulfur through a process known as the Claus reaction, which consists of a thermal reactor and two catalytic reactors. The thermal reactor partially burns the hydrogen sulfide. The resulting $H_2S/SO_2$ mixture is converted to elemental sulfur and recovered in that form in the Claus unit. Residual $SO_2$ and other gases ("tail gas") are routed to the sulfur recovery unit tail gas incinerator and then released into the air. The molten elemental sulfur is transferred to a sulfur pit for storage as a product and then sold commercially. Typically, two-

stage Claus sulfur recovery units convert 90 to 95% of the hydrogen sulfide into elemental sulfur.

In June 1986, Thomas Graney became Manager of Operations at defendant's refinery in Superior. In that position, he was responsible for the day-to-day operations of the process units, including the sulfur recovery unit. He does not consider himself an expert in sulfur recovery units. When he began work, the Claus unit was not running well. It was off line much of the time and had frequent mechanical failures. During the period 1986–87, Graney retained a firm known as Sulfur Operations Support to help fix the design problems of the sulfur recovery unit. Graney received four letters or reports from Sulfur Operations Support between January 1987 and May 1987, containing analyses of the sulfur plant. The firm's conclusion was that the combustion chamber of the sulfur recovery unit was too small.

In 1987 and 1988, defendant made physical changes to the sulfur recovery unit at a cost of more than $250,000 by upgrading the primary burner, replacing the catalyst, installing a new and larger combustion chamber, adding an acid gas knock-out drum and a tail gas analyzer, as well as adding a hydrocarbon coalescer in the upstream amine unit and installing a distributed control system. These changes served to improve the reliability of the unit and to improve its sulfur recovery efficiency.

On February 18, 1988, the Wisconsin Department of Natural Resources issued a notice of violation to defendant for violating the state's Statewide Sulfur Dioxide Rule, Wis. Admin. Code § NR 417.07(2)(g), which limited $SO_2$ emissions from the Claus sulfur recovery unit to 843 pounds an hour over any three hour period and 6,743 pounds an hour over any 24 hour period. In a February 29, 1988 response to the notice of violation, defendant stated

that the modifications to the refinery that it had begun would enable it to be operating the sulfur recovery unit by July 29, 1988 and to demonstrate full compliance with the proposed alternate emission limits no later than September 1988. When the sulfur recovery unit and associated amine system were not operating, sour gases bypassed the sulfur recovery unit and were burned directly without pollution control, causing an increase in sulfur dioxide emissions that in 1988, 1990 and 1991 sometimes exceeded the legal limits under the Wisconsin Administrative Code.

On April 8, 1988, Department of Natural Resources staff held an enforcement conference with defendant to discuss resolution of the February 18, 1988 notice of violation. Pursuant to the department's directive, defendant presented a proposal and schedule to undertake various enhancements to the sulfur recovery unit that would reduce sulfur dioxide emissions from the refinery and bring the refinery into compliance with state sulfur dioxide rules. The department found the proposal acceptable for compliance with $SO_2$ rules.

Mark Miller started working at defendant's refinery in January 1989 as a process engineer with responsibility for assisting the operations department in improving the running of the refinery process units and the sulfur recovery unit. At the time, defendant was still having problems as a result of the unit's lack of mechanical reliability. Downtime for the sulfur recovery unit resulted in excessive $SO_2$ emissions. Defendant retained Western Research to conduct a comprehensive full performance test on its sulfur recovery unit. Western Research provided a report to defendant before July 14, 1992, the date on which defendant submitted its No. 2 distillate unifier permit application to the Department of Natural Resources. Part of the

Western Research work was to prepare a "material balance" of the sulfur recovery test, that is, a summary of the components going into a unit and those leaving the unit. Also, Western Research evaluated the sulfur recovery efficiency of the sulfur recovery unit as of a particular day in October 1989. In its report, it stated that the calculated recovery efficiency was 95.5% and the rated or expected recovery efficiency was 96.2%.

On March 18, 1990, the Wisconsin Department of Natural Resources issued another notice of violation to defendant for violating Wis. Admin. Code § NR 417.07(5), which limited $SO_2$ emissions from the tail gas incinerator at the sulfur recovery unit to 393.4 pounds an hour. In 1990, defendant retained Becker, Losier & Associates, which subcontracted with E & L Engineering to study possible improvements in the operation of the sulfur recovery unit. Defendant's process engineer Miller served as defendant's point of contact with E & L. Earlier, in a report dated September 28, 1989, Walt R. Losier of the firm had reviewed defendant's sulfur recovery unit problems and had made recommendations for changes to solve the problems.

On April 3, 1990, E & L prepared a comparison study of the existing design of the sulfur recovery unit and a future revised design that would add a new 9.0 pound per square inch gauge blower and deeper sulfur seal legs, allowing an increase in acid gas flow equal to 16.0 long tons of sulfur a day. On April 23, 1990, Miller asked E & L to add a new design case to "determine the unit capacity bottlenecks when additional acid gas is brought into the unit." Defendant was aware that environmental regulations would require it to reduce the amount of sulfur in the distillate (diesel) fuel. In anticipation, it wanted to know what it would take to make the

sulfur recovery unit process an extra four long tons of sulfur a day. Defendant knew as early as 1990 that it would have to increase the capacity of the sulfur recovery unit to produce low sulfur diesel fuel. At the time, the design capacity of the unit was 15.1 long tons a day of sulfur.

On May 8, 1990, E & L reviewed the existing sulfur unit design in light of the future requirements for several cases. (The parties seem to use the word "cases" to refer to design alternatives.) Defendant gave serious consideration to only two of the cases, both of which anticipated adding the sour water system off-gas, adding a new combustion air blower and increasing the depth of the sulfur seal legs. One of the cases would have required an 8.0 pound per square inch gauge blower. Instead, defendant purchased two new air combustion blowers, one of 9.0 pounds per square inch gauge and another of 11.5. As of July 26, 1990, defendant had asked E & L to provide 17 to 18 foot sulfur seal legs and determined that the design should be based on the 11.0 pounds per square inch gauge air blower case. Defendant was responsible for obtaining the necessary construction permits.

On May 21, 1990, David Petty, an employee of defendant, wrote to the Wisconsin Department of Natural Resources, asking for a determination whether two proposed alternatives for modification of the existing sulfur recovery unit would trigger the need to comply with New Source Performance Standards. He stated in the letter that the sulfur recovery unit had a nominal design capacity of 14 long tons a day and that ordinarily, New Source Performance Standards do not address Claus units smaller than 20 long tons a day capacity. A department employee, Scott Humrickhouse, replied to defendant's letter. He noted the reliability problems defendant had had with its sul-

fur recovery unit and the excessive $SO_2$ emissions that were the consequence of the frequent periods of downtime. He listed the alternatives Petty had described in his May 21 letter and said that neither would trigger New Source Performance Standards or Prevention of Significant Deterioration requirements or require a new source air pollution control permit. He asked defendant to submit a plan and schedule for "design, construction and operation of the [sulfur recovery] unit" by July 30, 1990.

On July 30, 1990, James Gesick, manager of defendant's refinery, wrote to the department, stating that defendant agreed to undertake the 1991 sulfur recovery unit improvements and that it had elected to separate the amine and sulfur recovery systems. He provided a detailed schedule for completion and he noted that defendant was undertaking the work on the understanding derived from the department's 1990 Applicability Determination that the work would not trigger either New Source Pollution Standards or Prevention of Significant Deterioration requirements. On October 16, 1990, Ron Anderson, Gesick's replacement, wrote to Humrickhouse, stating that defendant's plan should eliminate the reliability problems experienced in the past.

In a letter dated October 16, 1990, defendant informed the department again of its intention to proceed with the sulfur recovery unit improvements and to provide periodic updates to regulators.

On September 21, 1990, plaintiff issued a finding of violation to defendant for violating the New Source Pollution Standards by an unrelated process unit (a heater) at defendant's refinery. On November 13, 1990, plaintiff held a "Section 113" conference with defendant to discuss the finding of a violation. During the conference, defendant stated that because of mechanical problems with its sulfur recovery unit, it

was constructing a modification to the unit under the guidance of the Wisconsin Department of Natural Resources and that the project was not subject to New Source Pollution Standards. In response to a request by plaintiff, defendant sent Sylvia Lopez, an air engineer employed by plaintiff, copies of the correspondence between defendant and the Wisconsin Department of Natural Resources in 1990, concerning the modifications to be made to the sulfur recovery unit.

On January 24, 1991, Lopez and Jeff Trevino, a lawyer for plaintiff, gave preliminary confirmation to the Department of Natural Resources' position that defendant's construction of its second alternative plan for the sulfur recovery unit was not subject to New Source Pollution Standards and did not require construction or operation permits. After receiving the 1990 Applicability Determination, defendant began construction on the 1991 sulfur recovery unit project and began providing both plaintiff and the Department of Natural Resources with periodic progress reports. In April 1993, after the project was completed, the department inspected the refinery, including the sulfur recovery unit, and found "some improvement to the operation" during the preceding year. The author added, "The rebuild of this unit has proved to be very helpful." This report was provided to plaintiff's Region 5 office.

Among the activities associated with the 1991 sulfur recovery unit project was the rerouting of sour gas generated by a device called the sour water stripper to the sulfur recovery unit for pollution control purposes. Before this project was undertaken, defendant had sent the sour water stripper gas to an incinerator where sulfur byproducts from its combustion were discharged directly into the atmosphere without the benefit of a pollution control de-

vice. Defendant told the Department of Natural Resources about the planned re-routing in a letter dated November 2, 1990. The re-routing resulted in a reduction of approximately one ton a day of sulfur emissions from the refinery.

The other modifications that defendant made to the sulfur recovery unit in 1991 included replacing the 9 foot sulfur seal legs with deeper 18 foot legs; installing a new and larger sulfur pit; installing two new air combustion blowers, one 9.0 pounds per square inch and one 11.5 pounds per square inch; replacing and increasing the heat exchange surface of the waste heat boiler, enlarging the condenser surface area on the sulfur recovery unit. Also, by 1991, defendant had eliminated the use of hot gas bypass on the sulfur recovery unit.

On March 23, 1998, United States Environmental Protection Agency Region 5 issued defendant a request pursuant to 42 U.S.C. § 7414, asking for information about the "design capacity" and "maximum operating capacity" of defendant's sulfur recovery unit and for any date on which defendant had increased those capacities. Defendant responded that before 1991, the unit's capacity was estimated to be 14.0 long tons a day and that modifications made in 1991 had increased the design capacity by 0.4 long tons a day over the original design, for a total capacity of 14.4 long tons of sulfur a day after the renovation. Plaintiff determined that defendant's sulfur recovery unit was not subject to the requirements of the Clean Air Act's New Source Performance Standards.

During a 1998 National Enforcement Investigations Center inspection of defendant, plaintiff's inspectors reviewed defendant's annual sulfur production records from 1990 to 1997. From this review, they came to believe that sulfur production had exceeded the 20 long tons a day level during October 1996. Plaintiff's National Enforcement Investigations Center included the sulfur production data in its final inspection report, dated November 1998, and provided the information to Region 5 and the Wisconsin Department of Natural Resources.

The information triggered an investigation into the history of the modifications to defendant's sulfur recovery unit. In late October 1998, Department of Natural Resources employees Steve Dunn and Dan Rosenthal began to investigate the capacity of defendant's unit. The department turned over the results of the investigation to plaintiff, which determined that defendant had provided inaccurate responses in the past regarding the unit's capacity.

b. Defendant's No. 2 distillate unifier

After undertaking the sulfur recovery unit improvements in 1988 and 1991, defendant considered improving its No. 2 distillate unifier to allow it to produce diesel products with lower sulfur content. On April 20, 1992, Mark Miller sought regulatory guidance from Dan Rosenthal, the local Wisconsin Department of Natural Resources compliance engineer. Defendant described the proposed project and provided a schedule for completion of the project. Miller wrote that "[t]he sulfur production and $SO_2$ emissions are based on 90 percent sulfur recovery efficiency. The unit normally operates at a higher recovery efficiency (approximately 93–95%)."

On April 22, 1992, Manager of Operations Graney wrote to his supervisor, W.E. Heck, reporting that Rosenthal had told Miller that the incremental feed to the sulfur recovery unit from the No. 2 distillate unifier project would require an air permit application. Graney noted that "pre-permit construction variance may not be allowed if we have to do a [Prevention of Significant Deterioration] permit." Defendant obtained a pre-construction per-

mit. Additionally, Rosenthal told Miller that the No. 2 distillate unifier project would be subject to the Prevention of Significant Deterioration requirements, which would require air dispersion modeling and best available control technology analysis for the sulfur recovery unit.

As of May 1992, defendant was working within a tight time frame to get the No. 2 distillate unifier project completed. Defendant wanted to start producing low sulfur diesel fuel by August 1, 1993. Graney thought the need for Wisconsin Department of Natural Resources approval before construction began was a good reason to avoid the Prevention of Significant Deterioration rules.

On May 29, 1992, approximately two months before defendant submitted the No. 2 distillate unifier permit application, Miller advised Graney that the heat recovery unit tubes were leaking diethylamine into the Claus side of the process during the September 13, 1989 stack test. Miller told Graney he believed that, although four stack tests were conducted, the sulfur recovery unit was running well only during the stack test of October 31, 1989. When defendant amended its No. 2 distillate unifier permit application, defendant wrote that both it and the Department of Natural Resources had "agreed that the basis for setting the baseline emissions will be to utilize the total sulfur shipped out of the plant. However, to utilize this figure, a calculation/assumption on the sulfur recovery efficiency must be made. This calculation/assumption has been on the basis of two stack tests cited in # 2 above [those performed on September 13, 1989 and October 31, 1989]." In a letter dated September 28, 1989, Walt Losier noted that during the first site visit in mid-September 1989, the tail gas in the sulfur unit had a very low ratio of $H_2S$ to $SO_2$. Defendant anticipated that the ratio would improve once the "Western R & D unit" was oper-

ating satisfactorily and the sample system changed and that it would give an efficiency of sulfur recovery from the acid gas in the range of 90 to 92%. The May 15, 1992 letter from Becker provided defendant with current sulfur recovery efficiency information of 95 to 96%. Becker estimated the ten percent sulfur loading capacity of the sulfur recovery unit and the available sulfur capacity of the unit, noting that a higher sulfur input would not decrease overall efficiency.

On July 6, 1992, Miller wrote to the Department of Natural Resources about defendant's project to produce low sulfur diesel fuel, stating that "both the increased feed rate and sulfur dioxide emissions are well within the maximum design capacity of the [sulfur recovery unit]." He estimated that the current daily maximum of sulfur was 14 long tons a day, with a maximum design of 19 long tons a day for the sulfur feed and a projected daily maximum sulfur feed of 17 long tons a day. He wrote that in his opinion the project was exempt as a specified change in operation because changes in sulfur removal at the No. 2 distillate unifier resulted in an increase in sulfur production that did not exceed the operating capacity of the sulfur recovery unit.

Defendant met with department staff on July 8, 1992, to discuss the proposal and the potential need for a permit. The department sought regulatory guidance and an opinion from plaintiff (although it continued to insist that defendant have a state permit). Region 5 told the department that a Prevention of Significant Deterioration permit was needed unless defendant was to "net out" or restrict emissions through a "synthetic minor permit."

On July 14, 1992, defendant submitted a permit application seeking authorization to modify its No. 2 distillate unifier. At the request of the Wisconsin Department of

Natural Resources, defendant amended its application to obtain a "synthetic minor permit." As part of the No. 2 distillate unifier permit application, defendant had to show what the actual SO₂ emissions were before the project and what they would be after the project. Defendant chose to use a baseline period of August 1, 1989 to August 1, 1991, and a baseline recovery efficiency of 90% taken from the October 31, 1989 stack test. Defendant contended that it had improved the sulfur recovery unit recovery efficiency from 90% to 93% and took credit for emission reductions. It contended also that the distillate unifier project would result in a net decrease of 22 tons a year of $SO_2$ emissions.

On September 17, 1992, refinery manager Ron Anderson sent the Department of Natural Resources a letter revising the No. 2 distillate unifier permit application and specifically revising the baseline recovery efficiency estimates by claiming a pre-project recovery efficiency of 86% for the period before the 1991 sulfur recovery unit modification rather than the 90% recovery efficiency for the entire period submitted in the original No. 2 distillate unifier permit application. In connection with its permit application, neither Graney nor Mark Miller provided the 1987 analyses of the sulfur recovery unit defendant had received from Sulfur Operations Support.

On November 13, 1992, after an extensive exchange of correspondence and various meetings, the department issued defendant Air Permit No. 92–POY. The department determined that the modifications involving the No. 2 distillate unifier would be exempt from Prevention of Significant Deterioration review because defendant had agreed to abide by synthetic minor permit limitations that restricted emissions from the refinery to levels below Prevention of Significant Deterioration applicability thresholds. The department concluded that the pro-

posed change would be minor because the increase of sulfur dioxide emissions would be less than 40 tons a year. The department stated in the permit that the project would not trigger Prevention of Significant Deterioration review or other requirements. It mailed copies of the permit to solicit comments from various interested parties, including plaintiff. The cover letter advised recipients that they had 30 days in which to appeal the decision if they objected to it.

During the 30–day appeal period, plaintiff's Region 5 inspectors toured the refinery to inspect air pollution sources at the refinery and determine compliance with all applicable air rules. Plaintiff's staff discussed the sulfur recovery unit, the No. 2 distillate project and the air permit, No. 92–POY. Plaintiff never filed an appeal or any other objection to the issuance of the permit.

During 1992, defendant constructed a new amine tower for separating hydrogen and $H_2S$ at the refinery's No. 2 distillate unifier. Between 1992 and 1993, defendant increased the reactor size of the No. 2 distillate unifier.

Six years later, in a 1998 inspection of defendant, plaintiff concluded that defendant's sulfur recovery unit had a sulfur input capacity of greater than 20 long tons a day. Plaintiff undertook further investigation and subsequently issued a finding of violation to defendant on November 25, 1998, alleging that defendant was in violation of New Source Pollution Standards Subpart J. On September 29, 2000, plaintiff issued a notice of violation to defendant for its alleged failure to provide all relevant information in support of a permit application.

At all times relevant to this suit, the state of Wisconsin had the authority to issue Prevention of Significant Deterioration permits. Defendant first discussed

the No. 2 distillate unifier project with Department of Natural Resources staff in April 1992, only six months after defendant's completion of the sulfur recovery unit modifications. The Department of Natural Resources did not treat the modifications as one project.

In September 1988, the Department of Natural Resources began enforcing the 393 pounds an hour limitation as an enforceable limit for $SO_2$ emissions from the sulfur recovery unit.

### 2. *Settlement with state*

In December 1992, the state of Wisconsin initiated an enforcement action against defendant, alleging various violations of Wisconsin statutes and the Wisconsin Administrative Code that are part of the approved state implementation plan. The department provided plaintiff with a copy of its complaint on the day it was filed in Circuit Court for Douglas County. After extensive negotiations, the parties resolved the claims raised in the action by a stipulation for settlement that was entered as a judgment in the circuit court on August 19, 1994. Plaintiff was not a party to the action, but it was involved in discussions with the state regarding the settlement and followed the progress of the action and the negotiations closely during the three years the action was pending. It intended to file an action of its own if the state litigation was not resolved promptly.

On February 6, 1991, Wisconsin Department of Natural Resources Engineer Dan Rosenthal toured the Superior Refinery and met with Jim Kowitz, Refinery Manager. During the tour, Rosenthal expressed the department's intention to resolve "all outstanding air issues at the Spooner [enforcement action] meeting." On December 7, 1992, plaintiff inspected defendant's refinery, including the sulfur recovery unit, with the stated purpose " . . . to inspect air pollution sources at Murphy

Oil to determine compliance with all applicable air rules." During the inspection, plaintiff asked about defendant's sulfur recovery unit operations, compliance with $SO_2$ emission limits and the state Air Permit, No. 92–POY–094. Plaintiff discussed amine unit operations, the past and present methods of monitoring the hydrogen sulfide/sulfur dioxide ratio and the applicable $SO_2$ emission limitation for the sulfur recovery unit.

The department provided plaintiff with a draft of the 1994 stipulation, which included the release language absolving defendant of liability for "any violation concerning emissions of sulfur dioxide or hydrogen sulfide which may have occurred within six years of this Stipulation and which emissions [defendant] had previously reported to the DNR." Plaintiff wanted to be sure that the stipulation would not release defendant from potential enforcement actions involving Resource Conservation and Recovery Act violations.

Following the settlement, defendant spent $25 million on pollution control projects at the refinery. The parties' settlement included the following provision:

> Compliance with the terms of this stipulation shall constitute full satisfaction and release of [defendant's] . . . liability for civil forfeitures or penalties and/or criminal liability for any and all violations alleged in the Complaint filed herein, the referral letter (with attachments) from the secretary of the Department of Natural Resources . . . to the Attorney General dated August 9, 1991, attached hereto as Exhibit A . . . and any violation concerning emissions of sulfur dioxide or hydrogen sulfide which may have occurred within six years of the date of this stipulation and which emissions [defendant] has previously reported to the DNR.

Between 1988 and 1993, defendant reported to the Department of Natural Resources all sulfur dioxide emissions from its refinery, including those from the sulfur recovery unit.

Exhibit A of the 1994 settlement agreement includes the following paragraph in Section B, Air Management Operations:

> [Defendant's] sulfur recovery process has been [sic] source of concern for several years. Initially, the primary problem was the unit's lack of efficiency. It removed less $HS_2$ than it was designed to remove. When this problem was eventually solved, another became evident—because of its poor design, the unit needs frequent repairs which necessitates taking it off-line. During these times, sour gas gets burned and excess $SO_2$ gets emitted.

### 3. *Claim five: opacity reading*

During the 1990s, plaintiff's National Environmental Investigation Center conducted "multimedia" compliance inspections of all petroleum refineries within Region 5, including one at defendant's refinery from May 26 to June 4, 1998 and from June 15 to June 19, 1998. Before the inspection, plaintiff issued defendant a document request, asking that certain information be available for on-site review. The engineers reviewed the documents, asked for additional ones and had copies made of certain documents for later review.

Preliminarily, the engineers made numerous findings of "noncompliance and areas of concern" and met with defendant's personnel at the end of the inspection to inform them of the potential findings.

On July 31, 1998, plaintiff issued a notice of violation for violation of the "fugitive source rules" and violation of the opacity limit of 40% from the stack of the four steam generating boilers. Stationary sources can discharge visible emissions into the atmosphere that are usually in the shape of a plume. Plaintiff conducts visible emission readings in accordance with U.S. EPA Reference Method 9 to determine opacity, that is, the degree to which emissions reduce the transmission of light and obscure the view of an object in the background. The opacity can be determined by a qualified, trained observer using certain procedures set forth in Reference Method 9.

Defendant operates four steam generating boilers that are vented to a single stack. The boilers produce 150 pound steam that is used at times for fueling some of the refinery processes. In 1998, the boilers were fueled by refinery fuel gas and No. 6 fuel oil.

While plaintiff was conducting an inspection of defendant's refinery during the period June 15 to June 19, 1998, two of its employees, Margaret Sieffert and Spiros Bourgikos, noticed a dark plume rising from the stack from the four steam generating boilers. The two decided it was appropriate to conduct visible emissions readings under the circumstances, although they had not planned on doing so and Seiffert did not have a Visible Emissions Observations Form with her. Nevertheless, she conducted observations of the smoke for 37 minutes on June 17. Her observations revealed six-minute opacity readings as high as 63%. When Sieffert made her observations, she did not record all of the items of information required for visual observations and she did not use a compass to determine directions. When she returned to her office five days later, she copied data onto a form. In doing so, she erred in placing a North arrow on the required sketch and when she described directions in the written part of the form. Several years later, she prepared a new sketch to depict what she believes was her

true position in relation to the plume, wind direction and relative position of the sun.

### 4. *Claim six: volatile organic compounds*

At a refinery, fugitive emissions can leak from system components that are in volatile organic compounds service, such as valves, flanges, pumps, compressors, sampling systems, open-ended lines and pressure relief valves. "Fugitive emissions" are emissions from any emission point within a facility other than a flue or a stack. A "volatile organic compound" is any organic compound that participates in atmospheric photochemical reactions. Defendant's refinery contains at least 6,640 system volatile organic compound components. Defendant has an established leak detection and repair program to monitor volatile organic compound components at the refinery. From June 15 through June 19, 1998, National Environmental Investigations Center inspectors visited the refinery to conduct an unannounced inspection of defendant's leak detection and repair program and to test for leaks and emissions of volatile organic compounds.

Plaintiff noted 16 separate instances between June 15 and June 19, 1998, when open lines at defendant's refinery were not sealed with a second valve, a blind flange, a plug or a cap. Plaintiff identified 76 components not repaired in 15 days. It found at least 49 separate, observed instances between June 15 and June 19, 1998, when pipeline valves or pressure relief valves in gaseous service were not visibly marked. It identified at least 16 occasions in 1995, 15 occasions in 1996 and 10 occasions in 1997 when leaking components at 10,000 ppm or greater were not fixed within 15 days.

Plaintiff's inspectors used Foxboro OVA–108 monitoring instruments, which are portable leak detection and repair instruments. The inspectors calibrated the instruments each morning before using them. They recorded on data sheets the monitoring results for each component monitored. Plaintiff's inspectors focused on valve evaluation. Plaintiff's inspectors identified 73 leaking valves among the approximately 2,700 valves in the nine process units monitored by plaintiff and by defendant's contractor.

Defendant's contractor identified only 37 leaking valves among the more than 6,640 valves in the nine process units defendant and plaintiff monitored. Plaintiff's inspection took place within 10 days of defendant's monitoring. Defendant's contractor found leaks in .56% of the valves; plaintiff's inspectors found 2.7%.

For the first two days of the inspection, defendant's monitoring contractor confirmed each of the leaking valves the inspectors identified. The contractor chose not to participate in the final day of monitoring.

### C. *Clean Water Act Claims (7–13)*

### 1. *Claims seven to nine: National Pollutant Discharge Elimination System*

Defendant discharges treated wastewater from a discharge point, identified as Outfall 001, into Newton Creek, a shallow drainage ditch that flows eventually into Lake Superior. On June 29, 1993, the Wisconsin Department of Natural Resources issued defendant Wisconsin Pollutant Discharge Elimination System Permit No. WI–0003085–5, which contained specified effluent limitations, monitoring requirements and other terms and conditions for defendant's discharges into Newton Creek. On August 27, 1993, defendant petitioned for a review of the permit. Among other things, defendant challenged (1) the department's reliance on a chloride limit that had not been promulgated as an administrative rule as required by Subchapter II of Wis. Stat. ch. 227; (2) the department's decision to maintain a dis-

charge point at Newton Creek and its failure to take into account the default mixing formula in establishing the water quality based effluent limitations; and (3) the department's derivation of the water quality criteria under Ch. NR 105 that resulted in effluent limitations for a number of substances, including selenium. In an alternative challenge, defendant requested a variance to the petition.

On August 2, 1994, the department modified Permit No. WI–0003085–5, partially approving defendant's request for a variance to water quality standards. The modified permit contained specified effluent limitations, monitoring requirements and other terms and conditions for defendant's discharges into Newton Creek. In a letter to defendant dated August 2, 1994, the department wrote

> The modification of Wisconsin Pollutant Discharge Elimination System (WPDES) Permit No. WI–0003085–5, initiated by the Department on June 17, 1994, has been processed. This modification incorporates revised effluent limitations, and associated conditions, based on variances to water quality standards.... The parameters for which the Department modified limits include total recoverable ... selenium ... and chlorides.

. . . . .

> The permit, which is attached, replaces the original permit issued on June 29, 1993. Please replace the original permit with the attached modified permit. All discharges from this facility and actions or reports relating thereto shall be in accordance with the terms and conditions of the original permit, as modified.

On August 16, 1999, the department issued defendant Permit No. WI–003085–6, which replaced Permit No. WI–0003085–5. The department never addressed defendant's petition for review of Permit No. WI–0003085–5.

Beginning December 1, 1995, the modified permit required defendant to meet certain effluent limitations, including the following:

| Effluent Characteristics | Daily Maximum | Weekly Average | Monthly Average | Other |
|---|---|---|---|---|
| Chlorides | – | 712 mg/L | – | 1,078,000 lbs./yr. |
| Selenium, Total Recoverable | – | 25µg/L | – | 37.8 lbs./yr. |

Defendant's modified permit expired on March 31, 1998. Defendant's timely application for renewal of its permit extended the expiration date of its modified permit, pending the department's final determination whether to renew the permit. Defendant continued to operate under its modified permit until August 15, 1999; its new permit became effective on August 16, 1999.

Defendant's discharge monitoring reports show that its discharge of chlorides through Outfall 001 exceeded the permissible weekly average contained in its modified permit for the following periods: March 8–14, 1996; March 22–28, 1997; and April 1–7, 1997. Defendant's discharge monitoring reports show that its discharge of selenium through Outfall 001 exceeded the permissible weekly average contained in its modified permit for the following periods: July 29–31, 1996; February 8–14 and 15–21, 1998.

The modified permit required defendant to monitor its discharge of Outfall 001 for phosphorous each month beginning December 1, 1995. Defendant was required to limit its discharge of phosphorous to an average of 1 mg/L per month beginning April 1, 1997, if its discharge of phosphorous exceeded 60 pounds in any of the 12 months for which representative phosphorous samples were reported before January 1, 1997. Under defendant's modified permit, compliance with the 1 mg/L limitation was determined on the basis of a rolling 12–month average. Defendant's discharge monitoring report in November 1996 showed a phosphorous discharge for the preceding month of approximately 132 pounds, which triggered the 1 mg/L limitation. Defendant's discharge monitoring reports show that the rolling 12–month average calculated for April and May 1998 of its discharge of phosphorous through Outfall 001 exceeded the 1 mg/L limitation contained in its modified permit. Under defendant's modified permit, a value calculated under the rolling 12–month average in excess of the 1 mg/L limitation is equivalent to an exceedance of a monthly average limitation.

### 2. *Claims ten to thirteen: spill containment and countermeasure plan*

In 1998, an environmental engineer with the National Environmental Investigation Center, inspected defendant's facility and was given a copy of defendant's 1996 spill prevention control and countermeasure plan. In 1998, the plan provided for future installation of a sufficient diked secondary containment area to a volume equal to the capacity of the largest tank plus sufficient freeboard for precipitation and provided for the installation of adequate secondary containment for slop oil tanks S–1 and S–2 and the common diked area for Tanks 21, 22 and 23.

In response to spills of petroleum compounds at tanks S–1 and S–2, defendant had proposed installation of containment areas around tanks S–1 and S–2 but such containment areas were not required by federal statute or regulation. Defendant delayed installation of the secondary containment structure around tanks S–1 and S–2 until it knew that such structures would not interfere with any of the department's future investigatory or remedial efforts. At the time of the inspection in 1998, the Wisconsin Department of Natural Resources had not notified defendant that the site would be closed (meaning no further remedial action was anticipated). At the time of the inspection in 1998, defendant had not provided a sufficient secondary containment area for slop oil tanks S–1 and S–2. After the department gave verbal notification that the site would be closed in September 1999, defendant constructed secondary containment around tanks S–1 and S–2.

In 1997, defendant increased the height of the dike walls surrounding Tanks 21, 22 and 23. After the 1998 investigation, defendant verified the volume of the secondary containment area for Tank 57 and found it to be sufficient under the plan.

Defendant's spill prevention control and countermeasure plan was certified by a professional engineer on April 4, 1996. Defendant amended its plan in November 1996 and June 1997 but the amendments were not certified by a professional engineer. During the three years following the April 1996 certification, defendant eliminated potential spill sources and updated its list of potential spill sources. Defendant did not get its 1996 plan recertified after it had made changes to its list of potential spill sources.

The spill prevention control and countermeasure plan "record of changes" form dated April 2000 indicates that pages 14–6 through 14–41 of the plan were amended in 1997. Although not documented on the

record of changes form, pages 14–1 through 14–5 of the plan were amended in November 1996. At the time of the 1998 inspection, the 1996 plan consisted of amended pages 14–1 through 14–41.

D. *Resource Conservation and Recovery Act Claims (14–21)*

Defendant generates hazardous waste as a byproduct of its manufacturing processes at various locations throughout the refinery. From May 26 to June 4, 1998 and from June 15 to June 19, 1998, inspectors from plaintiff's National Enforcement Investigations Center conducted an environmental inspection of the refinery to determine defendant's compliance with various environmental statutes and regulations. Linda TeKrony conducted the Resource Conservation and Recovery Act portion of the inspection.

TeKrony toured the facility and reviewed records and documents. In response to a question about the location of defendant's laboratory waste materials, TeKrony was shown two locations where non-chlorinated solvents were being accumulated in brown glass bottles. One bottle was open and located under a fume hood; the other was positioned to collect additional waste from analytical equipment. Neither bottle was labeled to identify the contents.

Defendant generates hazardous waste at its wastewater treatment plant in the form of sludge, which is processed to remove recoverable oil, leaving thickener sludge containing hazardous solids. Defendant's wastewater treatment plant collects these solids and pipes them to a thickener tank. Thereafter, the sludge that accumulates is pumped out into large containers and from those containers into 55–gallon drums that are disposed of off-site.

On May 28, 1998, TeKrony observed four 55–gallon drums in defendant's wash pad area that were being used to accumulate hazardous wastes, including contaminated gravel, oily pads and rags and wash pad sludges. All of the drums were labeled as hazardous waste and all had covers in place but none of the covers was secured by its barrel cover locking ring.

Defendant's recorded inspections of the "less–than–90–day" hazardous wastes are organized by waste stream, with each waste stream's weekly inspections entered on a separate sheet beginning from the date of their initial accumulation. Seven of these weekly inspections were not recorded. However, some of the seven missing inspection records were for waste stream inspections that would have occurred in the same week.

TeKrony reviewed all hazardous and nonhazardous waste manifests and associated land disposal restriction notifications for off-site shipments of defendant's waste sent to each treatment or storage facility during the period January 1994 through May 1998. On 21 occasions between December 1995 and May 1998, land disposal restriction notices failed to identify all hazardous waste numbers applicable to the thickener sludge. In October 1995, a land disposal restriction notice that defendant submitted to a treatment or storage facility did not identify all hazardous waste numbers applicable to the heat exchanger bundle cleaning sludge. On fifteen additional occasions, between December 1995 and May 1998, land disposal restriction notices that defendant submitted to a treatment or storage facility did not include the EPA hazardous waste numbers, the manifest number associated with the shipment or the contaminants subject to treatment. On four occasions between January 1994 and May 1998, defendant failed to maintain for a period of three years copies of its land disposal restriction notifications submitted to a treatment or storage facility with shipments of its hazardous waste.

On December 18, 2000, the state of Wisconsin filed suit against defendant in the Circuit Court for Douglas County, Wisconsin, alleging several claims under the Resource Conservation and Recovery Act similar to those asserted by plaintiff in this case. The state asked for a stay in the state court action pending resolution of this action.

### E. Claims 22–24: Emergency Planning and Community Right–to–Know Claims

During the years 1994 to 1996, defendant manufactured, processed or otherwise used at its refinery the toxic chemicals ethylbenzene, toluene, xylene (mixed isomers), benzene, 1,2,4–trimethylbenzene, cyclohexane, ammonia, ethylene, hydrogen cyanide, hydrogen fluoride, propylene and diethanolamine. Defendant submitted Form R reports documenting its use of these toxic chemicals to the Environmental Protection Agency and the Wisconsin Department of Natural Resources for the years 1994, 1995 and 1996. In its Form R reports, defendant reported its storage tank air emissions as "fugitive" emissions for the toxic chemicals ethylbenzene, toluene, xylene (mixed isomers), benzene, 1,2,4–trimethylbenzene and cyclohexane. It did not report the emissions for these chemicals as "stack" air releases. Fugitive emissions tend to be diffuse and multidirectional; stack emissions are typically released through vents or other openings in a single direction.

Defendant's storage tanks have floating roofs that adjust to the level of their liquid contents. When the liquid is pumped out of the storage tank, the roof lowers, leaving behind traces of the liquid on the tank walls. Under its tank operating permits, defendant was required to control fugitive emissions by installing a welded internal floating roof and double wiper seals in each tank.

[In claims 23 and 24, the parties dispute certain statutory obligations defendant had under the Emergency Planning and Community Right–to–Know Act. Plaintiff asserts that defendant was required to prepare and maintain its threshold "calculations" and defendant argues that it was required to maintain its threshold "determinations." Without deciding the issue, I use the term "determination" throughout the fact section because that term is used in the relevant provision, 40 C.F.R. § 372.10(a).]

In support of its 1994 Form R report, defendant was required to prepare and retain its threshold determinations for a period of three years for many toxic chemicals, including ammonia, ethylene, formaldehyde, hydrogen cyanide, hydrogen fluoride, propylene and diethanolamine. For its 1995 Form R report, defendant was required to prepare and retain its determinations for the following toxic chemicals, among others: ethylene, formaldehyde, hydrogen cyanide, propylene and diethanolamine. For its 1996 Form R report, defendant was required to prepare and retain its determinations for ammonia, ethylene, formaldehyde, hydrogen cyanide, hydrogen fluoride, propylene and diethanolamine, among others. For each of the preceding years, defendant was also required to retain its threshold determinations for the named chemicals and have them readily available for inspection.

At the beginning of the 1998 inspection of defendant's refinery, Environmental Protection Agency inspectors submitted to defendant a document request list indicating the items that the inspection team anticipated reviewing during the inspection. Defendant organized all of the requested documents into boxes and labeled them according to the document request list. Among other things, the document request list asked for "documentation used

to complete Form Rs for the last five years (If computer generated, provide description of calculation methods)."

TeKrony reviewed all of the documents relating to the Emergency Planning act that defendant produced in response to plaintiff's document request. Defendant produced a three-ring binder with a section entitled "Threshold Calculations and Chemical Inventory" which included a chemical inventory and Material Safety Data Sheets for many products used at defendant's facility. Together, the use data (taken from the chemical inventory forms) and the concentration information (taken from the Material Safety Data Sheets) allow a determination of how many pounds of a given toxic chemical defendant used during a reporting year. After TeKrony had reviewed defendant's records, she found that threshold "calculations" in support of defendant's 1994, 1995 and 1996 Form R reports were not readily available for review for the toxic chemicals ammonia, ethylene, formaldehyde, hydrogen cyanide, hydrogen fluoride, propylene and diethanolamine; she determined that defendant had failed to prepare and retain threshold "calculations" for these toxic chemicals. Defendant believes that its threshold determinations for 1994, 1995 and 1996 were readily available and were made available to TeKrony at the time of the inspection.

At the conclusion of the inspection, TeKrony told defendant's refinery manager that she would review the threshold "calculations" that she found to be lacking if defendant could produce them at a later date. TeKrony did not receive any threshold "calculations" from defendant after the inspection. Kugle, defendant's inspection consultant, does not recall TeKrony's asking for additional support documentation.

## OPINION

### A. Clean Air Act Claims

#### 1. Defendant's affirmative defenses

In moving for partial summary judgment on plaintiff's Clean Air Act claims, defendant has raised nine affirmative defenses. Defendant argues that (1) claims one through three are barred by the expiration of the statute of limitations in 28 U.S.C. § 2462; (2) claims one through four are barred by a prior stipulation between defendant and the state of Wisconsin; (3) defendant's compliance with its air permit is deemed compliance with all state and federal air pollution laws; (4) Prevention of Significant Deterioration standards do not apply to any activities defendant undertook to improve the operation of its sulfur refinery unit because it is an air pollution control device; (5) plaintiff has failed to exhaust its administrative remedies; (6) claims one, two and three and five are unenforceable because they are based upon state regulations approved by plaintiff after the date of the alleged violation (claims one, two and three) or after the approved program expired (claim five); (7) claims one through four are barred by Wis. Stat. § 285.81(4); (8) plaintiff has acted incorrectly by comparing pre-improvement and post-improvement emissions; and (9) New Source Pollution Standards do not apply to the sulfur refinery unit because its design capacity does not exceed 20 long tons a day.

The parties did not discuss the standard that governs defendant's alleged failure to provide relevant information concerning its 1988 and 1992 construction projects. For the purpose of determining the claims brought under the Clean Air Act, I am assuming that something like strict liability is the operative standard. Under this assumption, all plaintiff will have to prove is that defendant failed to provide

information that it had in its possession or had knowledge of and that this information was material to the Wisconsin Department of Natural Resources' decisions concerning defendant's 1988 and 1992 construction projects. If plaintiff can make this showing, it will affect the outcome of plaintiff's underlying claims as well as defendant's affirmative defenses. Plaintiff will not have to prove that defendant acted knowingly or intentionally in withholding relevant information. Although plaintiff will still be required to prove its claims that defendant violated the Clean Air Act, it will have established the invalidity of the Wisconsin Department of Natural Resources' determinations that defendant's 1988 and 1992 construction projects were not subject to a Prevention of Significant Deterioration permit or application of the best available control technology.

### a. Statute of limitations

As a threshold defense, defendant argues that the government is barred by the statute of limitations from seeking damages for the violations it has alleged in claims one, two and three. In claim one, plaintiff has alleged that defendant failed to obtain a Prevention of Significant Deterioration permit in 1988, when it undertook modification of a major source; in claim two, plaintiff alleges that defendant violated the Clean Air Act when it modified its sulfur recovery unit in 1988 and in 1992 without utilizing Best Available Control Technology; and in claim three, plaintiff alleges that defendant failed to provide all relevant permit information in 1992 in connection with its application involving its No. 2 distillate unifier. Defendant relies for its defense on 28 U.S.C. § 2462, which is the general federal statute of limitations and which provides

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or oth-

erwise, shall not be entertained unless commenced within five years from the date when the claim first accrued, if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

■ Both parties agree that § 2462 applies to violations of the Clean Air Act. Defendant contends that any alleged violation of the Clean Air Act that occurred more than 5 years before June 29, 2000, the date on which plaintiff filed the complaint in this case, is beyond the applicable statute of limitations. However, plaintiff argues that the statute of limitations does not bar its request for damages for claims one, two and three because its claims fit within one or more exceptions to the statute: (1) the continuing violation doctrine; (2) the discovery rule; and (3) equitable estoppel and equitable tolling.

### (1) continuing violation

■ Plaintiff contends that claims one, two and three accrue each day that defendant operates its sulfur recovery unit and No. 2 distillate unifier without the proper Prevention of Significant Deterioration permits or utilizing the Best Available Control Technology and that the statute of limitations does not begin to run until the illegal conduct is complete. According to plaintiff, defendant's failure to undergo the Prevention of Significant Deterioration permitting process means that defendant is operating its sources continually in violation of the restrictions of the Clean Air Act. Defendant disagrees, pointing out that the federal and state statutory framework under which plaintiff seeks relief establishes separate permitting programs for pre-construction permits and operation permits. *See* 42 U.S.C. § 7475 (pre-construction permits), § 7661 (operation permits); 40 C.F.R. § 52.21; *see also* Wis.

Stat. § 144.391 (1988); Wis. Admin. Code § NR ch. 406 (construction permits), § NR ch. 407 (operation permits). Citing this statutory framework, defendant argues that a failure to obtain the proper permit or use the proper technology is a violation of the Clean Air Act that accrues only once: on the day construction commences without the required permit or technology. If defendant is correct, the statute of limitations would have expired long ago.

Plaintiff seeks relief for claims one, two and three under 42 U.S.C. § 7475, which is entitled "Preconstruction requirements." Section 7475 provides that

(a) **Major emitting facilities on which construction is commenced.** No major emitting facility on which construction is commenced after August 7, 1977, may be constructed in any area to which this part applies unless—

(1) a permit has been issued for such proposed facility in accordance with this part setting forth emission limitations for such facility which conform to the requirements of this part;

(2) the proposed permit has been subject to a review . . .

. . . . .

(4) the proposed facility is subject to the best available control technology for each pollutant subject to regulation under this chapter emitted from, or which results from, such facility;

Section 7661 governs operation permits, stating

[I]t shall be unlawful for any person to violate any requirement of a permit issued under this subchapter, or to operate . . . a major source . . . except in compliance with a permit issued by a permitting authority under this subchapter.

The Wisconsin statutes in force at the relevant time distinguished between construction and operation permits. Wis. Stat. § 144.391(2)(b) (1988) provided that

1. Construction permit. No person may commence construction, reconstruction or replacement or commence modification of an attainment area major source unless the person has a permit from the department.

2. New operation permit. No person may operate an attainment area new major source or operate an attainment area modified major source unless the person has a permit from the department.

Relying on the distinction between construction and operation permits, defendant argues that plaintiff's claims relating to the pre-construction permitting process are time-barred. In defendant's view, plaintiff could have brought claims alleging that defendant failed to operate its major sources in compliance with the Clean Air Act; it chose not to, focusing instead on the alleged deficiencies in the construction and permitting process, as shown by its invocation of 42 U.S.C. § 7475 (Preconstruction Requirements). Plaintiff's response is to argue that during the relevant time period, the Wisconsin Department of Natural Resources issued integrated Prevention of Significant Deterioration permits, which covered both construction and operation of a modified source and that the integrated nature of the permits allows plaintiff to challenge illegalities in the original construction process *and* in the operation of the new and modified equipment. This argument attempts to put form over substance. Even if the department issued construction and operation permits on a single piece of paper, its doing so does not change the accrual date of plaintiff's violations. Moreover, as noted, the federal and state statutory schemes set forth separate guidelines for constructing or modifying a

major source and for operating a major source.

Other district courts have reached similar conclusions. In *United States v. Campbell Soup Co.*, No. S–95–1854, 1997 WL 258894 (E.D.Cal. March 11, 1997), for example, the United States brought suit against Campbell Soup for violations of the Clean Air Act, alleging that the company had failed to get the necessary construction permit and was operating certain machines without using the best available control technology. In response to Campbell Soup's assertion that the government's claims were barred by the statute of limitations, the government relied on the continuing violation doctrine, arguing that "Campbell continues to operate the machines that were built without permission." *Id.* The district court held that the state implementation plan distinguished between building a machine and operating it and that in its notice of violation, the government had not charged Campbell with violating the section of the plan that governed operation. *Id.* at *1. The court concluded that "even if the underlying intent behind the [California state implementation plan] regulation is to assure continuing air quality, the regulation cannot reasonably be construed to mean that building or altering a machine without a permit is a violation that continues as long as the machine still exists or is operated." *Id.* at *2.

In *United States v. Brotech Corp.*, No. 00–2428, 2000 WL 1368023 (E.D.Pa. September 19, 2000), the government argued again that it could recover damages for permit violations because the continuing violations doctrine tolled the statute of limitations. Citing *Campbell Soup,* the district court rejected the application of the continuing violations doctrine, stating, "[v]iolations of the various requirements to obtain construction permits or plan approvals occur at the time of the construction, modification, or installation of the equipment or facility." *Id.* at *3. *See also United States v. Westvaco Corp.*, 144 F.Supp.2d 439, 444 (D.Md.2001) ("[T]his Court follows the rationale of *Brotech* and holds that the statute of limitations bars the Government from bringing claims based on preconstruction permit violations where the construction was complete more than five years prior to the commencement of the lawsuit."); *Ogden Projects, Inc. v. New Morgan Landfill Co.*, 911 F.Supp. 863, 876 (E.D.Pa.1996) ("We agree that a violation of the [ ] permitting requirement occurs at the time of construction as the statute requires a preconstruction permit.")

In *United States v. Louisiana–Pacific Corp.*, 682 F.Supp. 1122, 1130 (D.Colo. 1987), the district court for the District of Colorado examined the language of the regulations implementing the Clean Air Act to determine the timing of a violation of the Prevention of Significant Deterioration regulations. Specifically, 40 C.F.R. § 52.21(r)(1) provides that "any owner or operator of a source or modification ... who commences construction ... without applying for and receiving approval hereunder, shall be subject to appropriate enforcement action." *See also* 40 C.F.R. § 52.21(i)(1) ("No stationary source or modification ... shall begin actual construction without a permit ...."); § 52.21(b)(11) (defining the term "begin actual construction" as "initiation of physical onsite construction activities on an emissions unit which are of a permanent nature."). The court concluded from the language in the regulations that "the violation occurs when the actual construction is commenced, and not at some later point in time." *Id.* at 1130.

In support of its position that claims one, two and three are continuing violations, plaintiff cites *United States v. Ma-*

*rine Shale Processors,* 81 F.3d 1329 (5th Cir.1996). The United States charged Marine Shale with violating the Clean Air Act by operating several minor emission sources without a permit. Marine Shale argued that "because emissions from each minor source began more than five years before the United States filed suit, section 2462 bars all minor source fines, even those occurring within five years of the filing of the complaint." *Id.* at 1357. The court rejected this argument, stating, "[s]ection 7413(b) contemplates a fine for each day a minor source operates in violation of the law, and section 2462 limits the number of days to five years before the filing of the complaint." *Id. See also United States v. American Electric Power Service,* Nos. 2:99–CV–1182, 2:99–CV–1250, 2001 WL 332496, at *5 (S.D.Ohio March 30, 2001) ("This Court concludes that 28 U.S.C. § 2462 limits the time to five years in which civil penalties may be sought for days in which the Defendants allegedly violated the [Clean Air Act].").

It is not clear whether the government charged Marine Shale with violating the relevant construction permit requirements or the operation permit requirements or both, a distinction that is crucial in determining the continuing nature of the violation. In addition, in *Marine Shale,* the court used the statute of limitation as a way to limit plaintiff's damages for defendant's refinery's emissions from minor sources to a five year period even though the emissions had begun more than five years before plaintiff brought suit. Limiting the number of days for which a plaintiff can recover damages to the length of the statute leaves the question whether the statute of limitations bars a plaintiff from bringing the suit at all; the statute of limitations seeks not only to limit damages, but also to accomplish such goals as preventing stale claims and assuring diligence in pursuing claims. If plaintiff demonstrates at trial that the statute of limita-

tions has been tolled on its Clean Air Act claims, it will be necessary to decide the period for which it may seek damages.

It appears that nothing in the statute creates a continuing liability for a facility's failure to obtain a pre-construction permit, a situation that strikes plaintiff as nonsensical. In its opinion, a one-time fine of $25,000 for failure to obtain the necessary pre-construction permits would be wholly inadequate. Without deciding the issue at this stage of the proceedings, I note that because defendant may be subject to injunctive remedies that can include shutting down the new construction or requiring extensive (and expensive) modifications, *see United States v. Banks,* 115 F.3d 916, 919 (11th Cir.1997) (holding that statute of limitations in § 2462 does not bar government from bringing action for injunctive relief under Clean Water Act), a $25,000 penalty does not amount to a cost-free decision for defendant. To the contrary, the one-time fine would entail great expense for defendant, if it were coupled with the costs of complying with an injunction requiring remedial efforts.

 The other cases plaintiff cites in support of the continuing violation theory are not persuasive because they do not involve either the same statutory schemes or analogous ones that draw distinctions between various types of permits. *See, e.g., United States v. ITT Continental Baking Co.,* 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975) (Clayton Act and Federal Trade Commission Act); *Alexander v. Local 496, Laborers' International Union,* 177 F.3d 394, 408–09 (6th Cir.1999) (Title VII and § 1981); *Brenner v. Local 514, United Brotherhood of Carpenters,* 927 F.2d 1283, 1295 (3d Cir.1991) (National Labor Relations Act and Labor Management Relations Act). I am persuaded that the statute of limitations for a violation of the pre-construction permit requirements

under 42 U.S.C. § 7475 begins to run at the time of construction and does not continue through the operational life of the modified source. Therefore, plaintiff cannot rely on the continuing violation doctrine to toll the statute of limitations on claims one through three.

### (2) discovery rule

 Alternatively, plaintiff contends that the discovery rule tolls the statute of limitations on claims one, two and three. In general, the discovery rule dictates that the statute of limitations begins to run "not [on] the date on which the wrong that injures the plaintiff occurs, but that date-often the same, but sometimes later-on which the plaintiff discovers he has been injured." *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir.1990).

At least one circuit court has tolled the statute of limitations on a claim brought pursuant to the Clean Water Act, holding that the enforcement claim did not accrue until the defendant filed the Discharge Monitoring Report required by the act. *See Public Interest Research Group of New Jersey v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64 (3d Cir.1990) (reasoning that public could not have known about any violation until report filed). Relying on this authority, a district court in the Seventh Circuit applied the discovery rule to the Clean Water Act for the following policy reasons: "(1) the inherent difficulty of detecting such violations; (2) the inevitable reliance of government agencies on a system of permits and self-reporting to enforce the act; and (3) the act's overall goal to 'restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *United States v. Material Service Corp.*, No. 95–C–3550, 1996 WL 563462, at *2 (N.D.Ill. Sept.30, 1996) (internal citations omitted).

Plaintiff points to one district court that has held that the discovery rule applies to enforcement actions under the Clean Air Act. *See L.E.A.D. v. Exide Corp.*, No. Civ–96–3030, 1999 WL 124473 (E.D.Pa. Feb.19, 1999) (finding that date of accrual is date on which notice of violation issued or quarterly reports of continuous emissions monitoring systems submitted). After listing the same policy reasons cited in *Material Service*, the court noted that "we do not see why the so-called 'discovery rule' should not apply to claims brought under CAA, as air pollution violations are also difficult for the public to detect, and the CAA's goal is similarly broad in its purpose 'to protect and enhance the quality of the Nation's air resources.'" *Id.* at *4. The reasoning in *L.E.A.D.* is not convincing. The court failed to take into account an important difference between the Clean Water Act and the Clean Air Act: unlike the Clean Air Act, the Clean Water Act contains a provision that imposes a duty on the source to self-report the effluent that it is discharging. *See* 33 U.S.C. § 1365(b)(1)(B). Only through these self-reports does the Environmental Protection Agency or the public learn of violations of the Clean Water Act. In *Public Interest*, 913 F.2d at 75, and *Material Service*, 1996 WL 563462 at *2–*3, the courts concluded that it made sense for the claim to accrue at the time the self-reports were filed because it is only at that moment that the public becomes aware that violations have occurred. "To hold that the statute [of limitations] begins to run when violations occur, as opposed to when they are discovered, would impede, if not foreclose, the remedial benefits of the statute." *Material Service*, 1996 WL 563462 at *3 (internal citations omitted). Although plaintiff argues that this reasoning applies with equal force to the Clean Air Act, the fact that the act does not rely exclusively on self-reporting makes the reasoning less per-

suasive. In this Clean Air Act enforcement action, plaintiff had access to files concerning defendant and made on site visits to the facility to inspect its operation well before it issued the notices of violation or received reports from defendant.

Defendant relies on *3M Co. v. Browner*, 17 F.3d 1453 (D.C.Cir.1994), in which the Court of Appeals for the District of Columbia Circuit declined to impose the common law discovery rule onto the federal statute of limitations, 28 U.S.C. § 2462, in the context of the Toxic Substances Control Act. The court noted that the discovery rule originated in cases in which latent or scarcely detectable injuries prevented plaintiffs from having a tenable claim for the recovery of damages until the harm became apparent. *See id.* at 1460. If harm is an element of the plaintiff's cause of action, the "discovery of injury" rule keeps the clock from running until all of the elements of the cause of action are complete. *See id.* The court found the "discovery of injury" rule inapposite to enforcement actions where the cause of action is compete at the time of the alleged violation. *See id.* The court rejected the plaintiff's proposed "discovery of violation" rule for several additional reasons: it is "unworkable; outside the language of the statute; inconsistent with judicial interpretations of § 2462; unsupported by the discovery of injury rule adopted in non-enforcement, remedial cases; and incompatible with the functions served by a statute of limitations in penalty cases." *Id.* at 1462–63. The reasons relied upon by the court in *3M* apply with equal force in this case.

Statutory violations may be difficult to detect for a variety of logistical and financial reasons but this difficulty "does not avoid the problems of faded memories, lost witnesses and discarded documents in penalty actions brought decades after alleged violations are finally discovered." *3M*, 17

F.3d at 1461. As the court noted in *3M*, the EPA is advocating a "discovery of violation" rule but "nothing in the language of § 2462 even arguably makes the running of the limitations period turn on the degree of difficulty an agency experiences in detecting violations." *Id.*

If it is determined at trial that defendant made affirmative efforts to prevent plaintiff from discovering the information that was necessary to discover defendant's alleged violations of the permit requirements under the Clean Air Act, plaintiff will be entitled to rely on the discovery rule to toll the statute of limitations. If this is not the case, plaintiff's request for penalties for claims one, two and three will be dismissed as barred by the five year statute of limitations set forth in § 2462.

### (3) equitable tolling and equitable estoppel

Plaintiff contends that the statute of limitations should be tolled by the doctrine of equitable estoppel because of defendant's allegedly fraudulent concealment. The Court of Appeals for the Seventh Circuit has explained that "equitable estoppel-sometimes referred to as fraudulent concealment-'comes into play if the defendant takes active steps to prevent the plaintiff from suing in time,' *Cada*, 920 F.2d at 450–51, 'such as by hiding evidence or promising not to plead the statute of limitations.' *Speer v. Rand McNally & Co.*, 123 F.3d 658, 663 (7th Cir.1997)." *Hentosh v. Herman M. Finch University*, 167 F.3d 1170, 1174 (7th Cir.1999). "The 'granting of equitable estoppel should be premised on a defendant's improper conduct as well as a plaintiff's actual and reasonable reliance thereon.'" *Id.* "Fraudulent concealment in the law of limitations presupposes that the plaintiff has discovered, or, as required by the discovery rule, should have discovered, that the defendant injured him, and denotes efforts

by the defendant-above and beyond the wrongdoing upon which the plaintiff's claim is founded-to prevent the plaintiff from suing in time." *Cada,* 920 F.2d at 451.

Plaintiff's reliance on equitable estoppel is misplaced. Plaintiff does not argue that defendant took affirmative steps to dissuade plaintiff from bringing suit *after* plaintiff discovered defendant's violations, such as by hiding evidence or promising not to raise the statute of limitations as a defense. *See Hentosh,* 167 F.3d at 1174. Defendant's alleged withholding of information is relevant to the discovery rule but not to the doctrine of equitable estoppel.

Plaintiff also contends that the statute of limitations should be tolled by the doctrine of equitable tolling because defendant failed to disclose information that was necessary for plaintiff to discover its claims. The Court of Appeals for the Seventh Circuit has explained that equitable tolling

> permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim. Equitable tolling is frequently confused both with fraudulent concealment on the one hand and with the discovery rule-governing, as we have seen, accrual-on the other. It differs from the former in that it does not assume a wrongful-or any-effort by the defendant to prevent the plaintiff from suing. It differs from the latter in that the plaintiff is assumed to know that he has been injured, so that the statute of limitations has begun to run, but he cannot obtain information necessary to decide whether the injury is due to wrongdoing and, if so, wrongdoing by the defendant.

*Cada,* 920 F.2d at 451 (internal citations omitted). Equitable tolling does not apply in this case for two reasons: (1) plaintiff is alleging that its inability to discover the relevant information was the result of defendant's wrongful behavior and (2) plaintiff is not alleging that it knew of its injury but could not bring the suit within the limitations period because it was unable to obtain the necessary information.

In arguing in support of its reliance on the doctrines of equitable estoppel and equitable tolling that defendant's failure to provide relevant information precluded it from bringing suit within the limitations period, plaintiff is making the same argument it makes in support of the discovery rule. Because plaintiff is arguing that defendant's failure to provide information resulted in plaintiff's inability to discover its claims against defendant, its argument fits within the discovery rule, not equitable estoppel or equitable tolling. Because I conclude that plaintiff cannot rely on the doctrine of equitable estoppel, I need not reach defendant's argument that plaintiff's equitable estoppel defense fails because plaintiff failed to plead fraud with particularity in its complaint in violation of Fed. R.Civ.P. 9(b).

#### (4) injunctive relief

 Plaintiff contends that even if the statute of limitations contained in § 2462 bars its request for damages for claims one, two and three, it may still seek injunctive relief under the Clean Air Act. The question is whether such claims are barred if plaintiff's claims for damages are barred by the statute of limitations under the concurrent remedy rule. *See Cope v. Anderson,* 331 U.S. 461, 67 S.Ct. 1340, 91 L.Ed. 1602 (1947). In *Cope,* the Court stated that "equity will withhold its relief in such a case where the applicable statute of limitations would bar the concurrent legal remedy." *Id.* at 464, 67 S.Ct. 1340.

Plaintiff contends that the concurrent remedy doctrine is inapplicable in this case, citing *Banks,* 115 F.3d 916. In *Banks,* the Eleventh Circuit addressed the

issue whether the concurrent remedy rule was applicable in a Clean Water Act case. The court explained that the concurrent remedy rule had to be read in conjunction with the well-established rule that " 'an action on behalf of the United States in its governmental capacity ... is subject to no time limitation, in the absence of congressional enactment clearly imposing it' " as well as the canon of statutory construction that "[s]tatutes of limitation sought to be applied to bar rights of the government, must receive a strict construction in favor of the government." *Id.* at 919 (quoting *E.I. Dupont De Nemours & Co. v. Davis,* 264 U.S. 456, 462, 44 S.Ct. 364, 68 L.Ed. 788 (1924)). The court of appeals noted that "[t]he statute [of limitations] is enforced against the government only when the government is acting to vindicate *private* interests, not a sovereign or public interest." *Id.* Concluding that § 2462 applies to civil penalties only, the court held that "the concurrent remedy rule cannot properly be invoked against the government when it seeks equitable relief in its official enforcement capacity." *Id.; see also United States v. Telluride Co.,* 146 F.3d 1241, 1249 (10th Cir.1998) ("we conclude the concurrent remedy rule does not bar the Government's claims for equitable relief"); *United States v. Hallmark Construction Co.,* 14 F.Supp.2d 1069, 1077 (N.D.Ill.1998) ("The Clean Water Act does not contain an express statute of limitations. The important question is whether the five-year statute of limitations set forth in 28 U.S.C. § 2642 for legal remedies applies to claims for equitable relief by the United States. The majority of courts have concluded that 28 U.S.C. § 2642 does not apply to claims for equitable relief by the United States. These courts express the better view.")

I agree that the five year statute of limitations applies to claims for civil penalties only. *See Campbell Soup,* 1997 WL 258894, at *1–2 ("Given the express statutory language that gives the Administrator power to bring an action 'without regard to the period of violation,' constrained only by § 2462 which does not address injunctive relief, the court finds that the government may seek equitable relief beyond the five year statute of limitations for penalty actions."); *see also Westvaco Corp.,* slip op. at 11 (holding the same).

Because nothing in the Clean Air Act itself or § 2642 precludes the government from seeking injunctive relief beyond the five year statute of limitations period, plaintiff's claims for injunctive relief for claims one, two and three are not barred by the statute of limitations even if § 2462 precludes it from recovering damages.

#### b. defendant's settlement with state

 In its opening brief on this subject, defendant argues in general terms that plaintiff should be barred from proceeding on its first through fourth claims against defendant because defendant settled a suit by the state that was brought in 1992 to address the same violations that are the subject of the first four claims in this suit. Under the terms of the settlement, the state agreed to release defendant from all liability for any emissions violations alleged in the state's complaint.

In response, plaintiff asserts that nothing in the statutory scheme of the Clean Air Act suggests that the federal government is barred from "overfiling," that is, proceeding against an alleged violator of the act after a state government has brought its own prosecution for the same violations. Not only is the act devoid of any prohibitory language but it recognizes implicitly in 42 U.S.C. § 7413(e) that overfiling may occur. Section 7413(e) provides that in assessing penalties a court or an administrator can take into account "payment by the violator of penalties previously assessed for the same violation ...."

Moreover, plaintiff argues, Congress amended the act specifically to insure that lagging or ineffective state prosecutions would not bar the federal government from taking its own enforcement actions. As a threshold matter, plaintiff argues that the question of overfiling does not even arise in this case because plaintiff's claims against defendant are separate and distinct from the state's previous claims of violations of state emission regulations. The federal claims are based on defendant's alleged failure to obtain the Prevention of Significant Deterioration permits it needs to operate the sulfur recovery unit (claim one), continuing to operate the unit without applying the Best Available Control Technology (claim two), failure to provide all relevant information in 1992 in support of its application to modify the sulfur recovery unit (claim three) and making changes to the sulfur recovery unit and distillate unifier that subjected the projects to New Source Pollution Standards sulfur dioxide emission limits (claim four). Plaintiff contends that these claims could not have been released by the stipulation because they are separate from the state's claims of illegal emissions, because they assert ongoing violations of the Prevention of Significant Deterioration and New Source Pollution Standards requirements and because the stipulated release applies only to emissions defendant had reported previously to the Department of Natural Resources. Plaintiff alleges that defendant did not make the required reports.

As I have explained, plaintiff did not allege continuing violations in its first four claims for relief. Moreover, the scope of defendant's reporting is a vigorously contested matter that can be resolved only by making determinations of disputed facts. However, for the purpose of deciding defendant's affirmative defense that the previous state prosecution bars plaintiff from pursuing these four claims, I will assume that the state and federal claims are essen-tially the same and that defendant reported all of its emissions violations. In other words, I will assume that defendant would be immune from liability if the state tried to prosecute it again for the claims it settled in 1994. Therefore, the only question is whether there is a legal bar to a new prosecution by a different sovereign.

In its reply brief, defendant has clarified its argument, characterizing it as based on principles of res judicata (claim preclusion). Under the doctrine of res judicata, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Defendant contends that the state and federal governments are so closely aligned as to be privies when it comes to prosecuting Clean Air Act claims.

As an initial matter, plaintiff maintains that the court should apply federal res judicata law rather than state. I am a little puzzled by this assertion. Federal law requires federal courts to look to state law to determine what preclusive effect a state court would give to a particular state court judgment. *See Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 466, 102 S.Ct. 1883, 72 L.Ed.2d 262 ("[28 U.S.C. § ] 1783 requires federal courts to give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged.") In this case, therefore, I must look to Wisconsin law to see how Wisconsin courts would treat the state court judgment in the state's 1992 prosecution of defendant. As a practical matter, Wisconsin law does not differ from federal law. Under Wisconsin law, a final judgment is conclusive in all subsequent actions between the same parties or their privies, as to all matters that were litigat-

ed or might have been litigated in the earlier proceedings. *See Northern States Power Co. v. Bugher,* 189 Wis.2d 541, 550, 525 N.W.2d 723, 727 (1995).

■ The first requirement for a finding of res judicata is the existence of a final judgment on the merits entered by a court of competent jurisdiction. Defendant entered into a settlement with the state of Wisconsin that was approved by the Circuit Court for Douglas County, Wisconsin. Wisconsin courts have held that a judgment entered pursuant to a written stipulation approved by the court or pursuant to a consent decree has the authority of an adjudication on the merits. *See Great Lakes Trucking Co., Inc. v. Black,* 165 Wis.2d 162, 168–69, 477 N.W.2d 65, 67 (Ct.App.1991) (holding that stipulation between parties had final preclusive effect when it was approved by court and was final determination of parties' rights). *Meyer v. Rigdon,* 36 F.3d 1375 (7th Cir. 1994), is not to the contrary. In that case, the Court of Appeals for the Seventh Circuit agreed that certain kinds of judgments such as consent judgments or default judgments do not have preclusive effect outside the bankruptcy law context. The court said, however, that a consent judgment could have such effect if " 'the parties could have reasonably foreseen the conclusive effect of their actions' " *id.* at 1279 (quoting *Klingman v. Levinson,* 831 F.2d 1292, 1296 (7th Cir.1987)). The court added that settlement agreements not approved by a court are not given preclusive effect, thus recognizing by negative implication the preclusive effect of settlement agreements that do have court approval.

Res judicata's second requirement is an identity between the causes of action in the two suits. I am assuming for the purpose of deciding these motions that this requirement has been met.

■ The third requirement is an identity of the parties or their privies in the two suits. Ordinarily, state and federal governments are considered separate parties for res judicata purposes. *See* 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedures* § 4458, at 502. Defendant does not contend that the United States and the state of Wisconsin are the same party. Instead, relying on *Donovan v. Estate of Fitzsimmons,* 778 F.2d 298, 301 (7th Cir.1985), defendant contends that privity exists between the two governments because (1) there is a congruence of legal interests between them; (2) the state represented plaintiff's interests adequately in the litigation it initiated; and (3) the relationship between the two parties is sufficiently close because of the identity of their interests.

Although the first and third of these requirements seem to overlap, I read the court of appeals' decision as distinguishing them in this manner: the first focuses on whether the precise claims asserted in the litigation are the same and the third focuses on the broader policy goals that the parties have. In *Donovan,* the court found that the first requirement was met because the Secretary of Labor pursued claims in litigation against various former trustees of the Central States Southeast and Southwest Areas Pension Fund that were the same as those brought in two other lawsuits against the same defendants by fund participants. The court found the second requirement met by the Secretary's active participation in the private party suits: "The Secretary participated actively in [the two participant suits], initially because [the three suits were consolidated] for purposes of discovery, and later through his involvement in every detail of the settlement process as a plaintiff-intervenor. Also, the Secretary was a 'full participant in the settlement process.' " *Id.* at 301. The Secretary attended and participated in 31 hearings before the court relating to the

settlement; he filed motions relating to the settlement on numerous subjects and filed memoranda and position statements on at least 18 different matters. *See id.* at 302.

For the third requirement, the court analyzed the Employment Retirement Income Security Act, 29 U.S.C. §§ 1001–1461, and concluded that private parties and the Secretary have the same public policy interests. ERISA's enforcement scheme grants equal standing to private parties and the Secretary to bring actions to protect the rights of the participants and beneficiaries of a given plan. *See id.* at 303. The Secretary's public interest under § 1132 does not extend beyond the interests of the private parties permitted to sue under the act. *See id.*

Defendant argues that the analysis in *Donovan* demonstrates that plaintiff is barred from bringing this litigation because plaintiff's claims are identical to those brought by the state. Also, like Secretary Donovan, plaintiff was involved closely in the prior state litigation and the interests of the two parties are the same. Both are responsible for the implementation and enforcement of the Clean Air Act and both share an interest in protecting the public and the environment from the emission of harmful substances into the atmosphere.

I conclude that *Donovan* is distinguishable from this case in significant respects that deprive the case of any precedential value. First, the Secretary's involvement in the three proceedings considered in *Donovan* was far different from plaintiff's involvement in Wisconsin's prosecution of defendant, which involved close monitoring but no direction of the litigation and no participation in hearings before the state court. Second, the relationship of state to federal government under the Clean Air Act is not the same relationship that plan participants and beneficia-

ries have to the Secretary of Labor under ERISA. Under ERISA, the plan participants and beneficiaries have equal standing with the Secretary to sue plan trustees for violations of fiduciary duty. Under the Clean Air Act, the federal government has enforcement authority that exceeds that of the states because Congress recognizes that the interests of the federal government extend beyond the boundaries of any particular state. *See, e.g.,* 42 U.S.C. § 7401(a) (stating in findings that predominant part of population lives in urban areas that often extend into two or more states and that there is need for federal financial assistance and leadership in developing cooperative federal, state, regional and local programs to prevent and control air pollution). *See also* § 7413(a)(1) (giving EPA administrator authority to take enforcement action against alleged violator thirty days after it has notified person and affected state of its finding of a violation) and § 7413(a)(2) and (5) (giving administrator authority to step in when state is failing to enforce Clean Air Act and regulations).

In addition to *Donovan,* defendant relies on *Harmon Industries, Inc. v. Browner,* 191 F.3d 894 (8th Cir.1999), for the proposition that res judicata bars the federal government from prosecuting Clean Air Act violations after the state has done so. In *Harmon Industries,* the Eighth Circuit held that under the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901–6992k, the EPA was barred from bringing its own enforcement action against Harmon after the company had worked out a voluntary compliance plan with the state of Missouri that imposed no penalties. The court of appeals relied on language that provided that a state authorized by the EPA to administer and enforce a hazardous waste program operates in lieu of the federal government's hazardous waste program, *see id.* at 897, and additional lan-

guage providing that "[a]ny action taken by a State under a hazardous waste program authorized under [the resource conservation act] [has] the same force and effect as action taken by the [EPA] under this subchapter," *id.* at 898.

As several district courts have observed, however, the Clean Air Act does not contain the same language that the Eighth Circuit relied upon in interpreting the Resource Conservation act. *See, e.g., United States v. LTV Steel Co., Inc.,* 118 F.Supp.2d 827, 833 (N.D.Ohio 2000) ("Unlike [the Resource Conservation act], the Clean Air Act contains language in its enforcement section which seems to anticipate overfiling" [referring to 42 U.S.C. § 7413(e)] ); *United States v. SCM Corp.,* 615 F.Supp. 411, 419 n. 20 (D.Md.1985) (discussing differences in language in Resource Conservation act and Clean Air Act); *United States v. Harford Sands, Inc.,* 575 F.Supp. 733 (D.Md.1983) (cooperation with state authorities does not affect defendant's liability to EPA). I conclude that *Harmon Industries* is inapplicable to Clean Air Act enforcement actions. Not only is the act devoid of the language the Eighth Circuit deemed important, § 7413(e) suggests that Congress anticipated overfiling and approved it when it provided that prior penalties paid could be taken into consideration in determining new penalties. Moreover, the 1970 amendments of the act evince a congressional intent to give the federal government authority to bring enforcement actions to respond to the "regrettably slow" progress that had been made under the previous statutory framework in which the federal government was prohibited from bringing an enforcement action unless a state failed to take appropriate action. *See* House Rep. No. 91–1146, 1970 U.S.C.C.A.N. 5360. Congress gave the federal government specific authority to bring enforcement actions upon notice to the state. It would stymie Congress's efforts to improve enforcement of the Clean Air Act to hold that the federal government had to forbear from bringing an enforcement action in any situation in which the state has undertaken enforcement actions, no matter how ineffectual or inadequate such actions have been. Additional support for this conclusion comes from the lack of any reference in the act to conditions on the taking of federal action, such as a requirement that the federal government must first evaluate the state's prior enforcement efforts or withdraw state authorization before it may prosecute violations of the act.

In a variation on its arguments under *Donovan,* 778 F.2d 298, defendant asserts that plaintiff had a sufficient "laboring oar" in the state litigation to bind it in the same way as if it was a named party. Defendant cites *Montana v. United States,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979), in support of this argument. In *Montana,* the United States was held to be bound by a judgment entered against Peter Kiewit Sons' Co. when the United States had required the filing of the suit to challenge taxes imposed upon contractors building public works, had reviewed and approved the complaint, had paid the attorney fees and costs, had directed the appeal to the Montana Supreme Court, had directed the filing of an appeal to the United States Supreme Court and had directed the company to abandon that appeal on the advice of the Solicitor General. *See id.* at 154, 99 S.Ct. 970.

*Montana* does not provide defendant much help. Under the broadest view of the undisputed facts in this case, plaintiff's role in the state litigation against defendant fell far short of the federal government's role in the litigation prosecuted in the name of Peter Kiewit Sons' Co. It is undisputed that the EPA was aware of the state's plan to litigate, that it received a

copy of the complaint immediately after the suit was filed in state court, that it agreed to watch the case closely and intended to pursue its own enforcement action if the state's case was not resolved promptly and that it toured defendant's Superior refinery just before the state brought its action and asked questions about the litigation. However, plaintiff's close monitoring of another sovereign's enforcement action against defendant does not show that it took the laboring oar in that action. *See also Restatement (Second) of Judgments* § 39 (1982), which provides that a person may be bound by the determination of issues as if he were a party if he "controls or substantially participates in the control of the presentation on behalf of a party." Defendant has adduced no evidence that plaintiff directed the state to file its action against defendant, that plaintiff paid any portion of the state's costs and attorney fees or directed the course of the litigation or the terms of the parties' settlement.

I am not persuaded by the reasoning of the court of appeals in *Harmon Industries*, 191 F.3d at 904, that the structure of acts such as the Clean Air Act and the Resource Conservation and Recovery Act bring the federal government and the state into such a close working relationship as to make them equivalent to the same party for purposes of res judicata. *See id.* ("The 'laboring oar' is pulled on much earlier in the process. It occurs at the authorization stage when the EPA grants the state permission to enforce the EPA's interests through the state's own" program). To reach such a conclusion in this instance would require ignoring the language, structure and purpose of the Clean Air Act.

One may question whether it is an effective use of finite agency resources to undertake sequential enforcement actions against the same alleged polluter or whether doing so conforms with some intuitive sense of fairness. These are policy questions that do not govern the legal determination whether the federal government is barred from prosecuting if the state has undertaken its own enforcement action under the Clean Air Act. I conclude that the answer to that determination is no.

c. defendant's compliance with air permit

▮ Defendant contends that in claims one through four, plaintiff is challenging the validity of the 1990 applicability determination and the 1992 air permit rather than defendant's compliance with those determinations and therefore that plaintiff must prove the invalidity of the determination and the permit. Defendant maintains that plaintiff is barred from doing so because federal and state statutes ("permit shields") protect parties that comply with their permits: compliance with an air permit constitutes compliance with all applicable air pollution laws. This affirmative defense raises the question central to much of the Clean Air Act prosecution: whether defendant provided all relevant information in 1992 in support of its application to modify a stationary source that would have assisted Wisconsin Department of Natural Resources authorities in analyzing the nature of the proposed changes it was making. If the permit is based upon accurate information and therefore is valid, plaintiff is challenging the permit rather than defendant's compliance with the Clean Air Act. In that case, plaintiff was required to object to the permit shortly after it was issued and it cannot do so now through this enforcement action. However, if defendant withheld relevant information, the permit is not valid. In that case, plaintiff is challenging defendant's compliance with the Clean Air Act and it will be necessary to determine whether plaintiff can pursue such a chal-

lenge against an entity operating pursuant to a state-issued permit. The question is an open one in this circuit. *See United States v. AM General,* 34 F.3d 472 (7th Cir.1994).

Because this affirmative defense depends upon whether defendant failed to disclose pertinent information, that determination cannot be made before trial because the facts are in dispute. Nonetheless, it may be helpful to the parties to have an analysis of the affirmative defense.

■ In claims one, two and three of the amended complaint, plaintiff alleges that defendant failed to comply with the Prevention of Significant Deterioration program regulations, incorporated into the Wisconsin state implementation plan, by failing to obtain a Prevention of Significant Deterioration permit to construct and operate the sulfur recovery unit in 1988 and 1991, by continuing to operate the unit without applying the best available technology and by failing to provide all relevant information in its 1992 application. Defendant contends that these three claims should be dismissed because compliance with the terms of its air permit indicates compliance with all applicable Wisconsin and federal emission limitations. As authority for this proposition, defendant relies upon 42 U.S.C. § 7661c(f), which states:

> Compliance with a permit issued in accordance with this subchapter shall be deemed compliance with section 7661a of this title. Except as otherwise provided by the Administrator by rule, the permit may also provide that compliance with the permit shall be deemed compliance with other applicable provisions of this chapter that relate to the permittee if—
> (1) the permit includes the applicable requirements of such provisions, or
> (2) the permitting authority in acting on the permit application makes a determination relating to the permittee

that such other provisions (which shall be referred to in such determination) are not applicable and the permit includes the determination or a concise summary thereof.

. . . . .

Known as the "permit shield," this statute precludes plaintiff from seeking civil forfeitures from an emission source with a permit if the provision being enforced was found not to apply at the time the permit was issued and that determination is specified in the permit. *See id.*

■ In addition to the federal permit shield, defendant relies on the Wisconsin equivalent of the federal permit shield that was approved by plaintiff as part of the Wisconsin state implementation program. That statute provides:

> Unless precluded by the administrator of the federal environmental protection agency under 42 USC 7661c(f), compliance with all emission limitations included in an operation permit is considered to be compliance with all emission limitations established under this chapter and emission limitations under the federal clean air act that are applicable to the stationary source as of the date of issuance of the operation permit if the permit includes the applicable emission limitations or the department, in acting on the application for the operation permit, determines in writing that the emission limitations do not apply to the stationary source and the operation permit includes that determination.

Wis. Stat. § 285.62(10)(b). The Wisconsin permit shield applies to operation permits issued pursuant to state as well as federal law. As a component of the state implementation program, the Wisconsin permit shield is federally enforceable and, defendant asserts, binding on plaintiff.

In this case, the permitting authority, the Wisconsin Department of Natural Resources, issued defendant an operation permit in 1992. In analyzing the permit application, the department determined that a Prevention of Significant Deterioration review and associated requirements did not apply to defendant's sulphur recovery unit or its No. 2 distillate unifier and stated that fact in the permit. According to defendant, so long as it operates in compliance with the terms of its air permit, it is operating in compliance with the Clean Air Act, including the provisions deemed to be inapplicable. *See Oregon Environmental Council v. Oregon Dept. of Environmental Quality*, Civ. No. 91–13–FR, 1992 WL 252123 at *27 n. 1 (D.Or. 1992) ("even if a permit was improperly issued [by an authorized state permitting agency], a source remains free from enforcement action against it so long as it complies with its permit . . .").

The federal permit shield creates a limited safe harbor for sources only if the permit is issued "in accordance with" the Title V permit program of the Clean Air Act, 42 U.S.C. § 7661c(f), which was enacted into law pursuant to the Clean Air Act amendments of 1990. The Wisconsin Department of Natural Resources began accepting applications for Title V operation permits on May 1, 1994. It would have issued defendant's 1988 and 1991 permits to modify and operate its sulfur recovery unit before May 1, 1994. Accordingly, plaintiff asserts, defendant operated the sulfur recovery unit pursuant to the Wisconsin state implementation plan rather than the Title V Permit program of the Clean Air Act or Wisconsin Administrative Code chapter NR 407, the Wisconsin equivalent of Title V. Moreover, plaintiff argues, because the Clean Air Act provides for enforcement against a facility for violation of any requirement or permit of the state implementation plan, *see* 42 U.S.C.

§ 7413(a)(1), plaintiff may bring suit for penalties and appropriate injunctive relief.

Defendant points out that its air permit was issued in 1992, after the 1990 amendments to the Clean Air Act had gone into effect. According to defendant, because Title V prescribes conditions and criteria for issuing Title V permits and plaintiff has not alleged that the 1992 air permit failed to meet these criteria, the federal permit shield applies. Relying on this timing, defendant asserts that its permit was issued "in accordance" with Title V.

Defendant's argument is unpersuasive. Defendant cannot escape the fact that its 1992 permit is not a Title V permit. The timing of the issuance of its air permit and the promulgation of Title V regulations means that the federal permit shield does not protect defendant from enforcement actions.

Plaintiff makes a strong case that the federal permit shield does not protect defendant in this instance, but plaintiff does not address the applicability of the Wisconsin permit shield. Defendant's 1992 air permit was issued pursuant to Wisconsin's state implementation program, which was approved by plaintiff. Because the operating permit states that Prevention of Significant Deterioration requirements did not apply to defendant's modifications, it meets the requirements of Wis. Stat. § 285.62(10)(b). So long as the 1992 air permit was issued on the basis of accurate information and is valid, the Wisconsin permit shield prohibits plaintiff from prosecuting defendant for alleged violations of Prevention of Significant Deterioration standards. However, it would be premature to grant defendant's motion for partial summary judgment on this claim because the validity of the 1992 permit hinges upon the factual determination of the accuracy of the information defendant provided to the Wisconsin Department of

Natural Resources when it applied for the permit.

Defendant disputes the enforcement action on the additional ground that plaintiff's remedy is to revise the permit pursuant to Wis. Admin. Code § NR 407.14(1) or (1m) rather than to bring an enforcement action if it believes that the 1992 air permit and the 1990 inapplicability determination are invalid or inaccurate because defendant failed to make full disclosure of all relevant facts. In support of this proposition, defendant relies on § NR 407.14, which requires the Wisconsin Department of Natural Resources to revise permits if they contain an inaccurate or mistaken provision. Section NR 407.14 reads in pertinent part as follows:

> (1) Mandatory revisions. The department shall revise an operation permit for any of the following reasons:
>
> . . . . .
>
> (d) The permit contains a material mistake or inaccurate or unclear statements.
>
> (1m) Discretionary revisions. The department may revise an operation permit for any of the reasons listed in sub. (1), regardless of the years remaining in the permit term, or for any of the following reasons:
>
> . . . . .
>
> (b) The permittee has failed to disclose fully all relevant facts when obtaining an operation permit.

Wis. Admin. Code § NR 407.14(1), (1m). Because neither the Wisconsin Department of Natural Resources nor plaintiff revised the permit, defendant argues, plaintiff cannot challenge the determination that Prevention of Significant Deterioration requirements do not apply to its No. 2 distillate unifier and its sulfur recovery unit. In essence, defendant asserts that the only remedy available to plaintiff is to correct the permit.

The difficulty with defendant's argument is that subsections (1) and (1m) do not apply explicitly to plaintiff. The provisions require the "department" to revise operation permits when they contain inaccuracies. *Id.* "Department" means the Wisconsin Department of Natural Resources, *see* Wis. Admin. Code § NR 400.02(53), and not plaintiff. Defendant's position rests on the assumption that plaintiff and the Wisconsin Department of Natural Resources function as the same entity. Although it is undisputed that the Wisconsin Department of Natural Resources is the permitting agent for air permits, it is unclear to what extent the duties and responsibilities of the two entities overlap. If plaintiff is not bound by language in the Wisconsin Administrative Code that specifies the "department," then it follows that plaintiff does not have a mandatory duty to revise operation permits that contain inaccuracies. Even if mention of the "department" implicates plaintiff, it is still unclear whether § 704.14 limits plaintiff to the remedy of modifying inaccurate permits. Moreover, if at trial the facts show that defendant failed to disclose information relevant to the issuance of the permit, defendant's argument becomes wholly unconvincing. If information was withheld, plaintiff would have had no reason to know of any need for modifying the permit when it was reviewing the permit and application documents.

d. Applicability of Prevention of Significant Deterioration standards to sulfur recovery unit

 Defendant takes the position that its sulfur recovery unit is not a stationary source of air pollution but a pollution control device that is not subject to Prevention of Significant Deterioration requirements. 42 U.S.C. § 7479(1) defines "major emitting facility" to include "any of the following stationary sources of air

pollutants which emit, or have the potential to emit, one hundred tons per year or more of any air pollutant from the following types of stationary sources: ..., petroleum refineries, ... sulfur recovery plants, ..." 40 C.F.R. § 52.21(b)(1)(i)(a) defines "major stationary source" to mean "any of the following stationary sources of air pollutants which emits or has the potential to emit, 100 tons per year or more of any pollutant subject to regulation under the [Clean Air] Act: ..., petroleum refineries, .... sulfur recovery plants, ..."

Plaintiff cites the statute and regulation to support its claim that defendant's sulfur recovery unit is a major stationary source subject to Prevention of Significant Deterioration standards. In opposition, defendant contends that because both "petroleum refineries" and "sulfur recovery plants" are listed as stationary sources and the sulfur recovery unit at issue in this case is part of a petroleum refinery, the statute and regulation must be referring to stand-alone sulfur recovery plants and not to sulfur recovery units installed in refineries.

Bearing on this question are two EPA memoranda, PSD 6 and PSD 89, the relevance and interpretation of which are in dispute. PSD 6 was issued on December 1, 1976. It addresses the question. "Is the addition of a sulfur recovery unit to an existing source normally subject to [prevention of significant deterioration standards]?":

> In most cases, the addition of a sulfur recovery plant to an existing [prevention of significant deterioration] source such as an oil refinery will act as a piece of control equipment and result in lower plant emissions (assuming no simultaneous emission production elsewhere in the plant). Thus, this addition would not be considered a modification to the existing source (oil refinery, etc.) since

no net increase in emissions has occurred.

> This interpretation makes more sense than would calling the sulfur recovery plant a new source (rather than an attempted modification to an existing source). Under the "new source" approach EPA may be placed in the undesirable position of disapproving a source which would directly reduce emissions at a given site and thereby preclude air quality improvement. The disapproval could result from the sulfur plant's failure to install tail gas cleanup which is typically required under [best available control technology] for sulfur recovery at oil refinery operations.

> Extrapolating from above, the review for [prevention of significant deterioration] seems to cover only those sulfur recovery plants associated with grass roots operations or expanded production capabilities of existing sources.

Dft.'s App. 456.

PSD 89 is a memorandum from the director of plaintiff's Division of Stationary Source Enforcement to a staff member in the Region II Enforcement Division, issued on April 12 of an unknown year. Citing regulations issued in 1978, PSD 89 provides that,

> Sulfur recovery plants are considered a major stationary source under the current [Prevention of Significant Deterioration] regulations. Although this is contrary to determination PSD [6], issued 12/1/76, that determination was based on the old [Prevention of Significant Deterioration] regulations. Those regulations specified that a modification was only subject to [Prevention of Significant Deterioration] if it resulted in a net increase in emissions plantwide. The current regulations subject a modification to PSD if it increases the potential emission rate above the cut-off, re-

gardless of any emission reductions achieved simultaneously at the source. Dft.'s App. 510. Defendant contends that PSD 6 applies to this case and it characterizes PSD 89 as "nothing more than a nearly illegible memorandum documenting a February 28, 1979 telephone conversation between two EPA staff members," Dft.'s Reply Br., dkt. # 130, at 73, rather than a document that was disseminated to the public. Plaintiff argues that PSD 6 has no applicability to this case: PSD 6 discussed the addition of a sulfur recovery unit to an existing source, whereas the challenged action in this case is a modification made by defendant to an existing sulfur recovery unit. Plaintiff contends that the changes defendant made to the sulfur recovery unit increased its processing capacity, relieved a bottleneck and increased refinery emissions. Plaintiff's argument is undercut by PSD 89, which reveals an understanding by plaintiff that PSD 6 applied to a modification of a sulfur recovery unit. Whether the sulfur recovery unit is a pollution control device subject to Prevention of Significant Deterioration requirements depends on whether it increased pollution. If the modification did not increase emissions from the refinery, Prevention of Significant Deterioration standards do not apply. *See, e.g., Alabama Power Co. v. Costle,* 636 F.2d 323, 400–403 (D.C.Cir.1979) (discussing requirement to obtain permit before making modification: "Where there is no net increase from contemporaneous [emission] changes within a source, we hold that [Prevention of Significant Deterioration standards] review, whether procedural or substantive, cannot apply.").

The facts about the net effect of the sulfur recovery unit modifications are disputed. On this motion for partial summary judgment, I cannot make the factual determination whether the sulfur recovery unit is a pollution control device, a major

stationary source or both. Resolution of this issue must await trial.

I conclude, however, that if at trial it is shown that the sulfur recovery unit is not a major stationary source, Prevention of Significant Deterioration standards will not apply to it. Plaintiff has failed to argue to the contrary, thereby conceding the inapplicability of Prevention of Significant Deterioration regulations to the sulfur recovery unit if it is found not to be a major stationary source. If the sulfur recovery unit is found to be both a pollution control device and a major stationary source, the standards will apply.

e. Failure to exhaust administrative remedies

■■■ This affirmative defense is closely related to defendant's seventh affirmative defense, that Wis. Stat. § 285.81(4) bars plaintiff from pursuing claims one through four against defendant. In both, defendant argues that plaintiff cannot pursue this enforcement action as it relates to claims one through four because these claims challenge the validity of an underlying permit rather than a violation of the terms of a permit.

In advancing this affirmative defense of failure to exhaust, defendant points out that the Wisconsin Department of Natural Resources notified plaintiff about the 1990 applicability determination and the 1992 air permit at the time they were made, yet plaintiff did not challenge either decision. Defendant asserts that both 42 U.S.C. § 7661d and Wis. Stat. § 285.81(1)(a) (formerly § 144.403) require that plaintiff seek an administrative hearing on final agency decisions within a specified time after the decisions are issued. For example, 42 U.S.C. § 7661d(b) limits plaintiff to 45 days after issuance of a permit in which to object on the ground that it is not in compliance with the Clean Air Act. Plain-

tiff is not subject to the time limitation in § 7661d, however, because that section applies to "Title V" operation permits only. Defendant's permit was not issued pursuant to Title V.

■■■ Wis. Stat. § 285.81(1) provides a 30–day window for challenging permits and determinations issued by the Wisconsin Department of Resources. Defendant argues that because plaintiff failed to meet this deadline, it has failed to exhaust its non-judicial remedies and the action should be dismissed. *See Ohio Forestry Assoc. v. Sierra Club*, 523 U.S. 726, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998); *Koehring Co. v. Adams*, 605 F.2d 280 (7th Cir. 1979). Plaintiff does not offer any opposition to defendant's argument that § 285.81 required plaintiff to challenge the applicability determination or the air permit within 30 days except to state that 42 U.S.C. § 7413 authorizes federal enforcement under the Clean Air Act and state implementation plans.

In *United States v. AM General Corp.*, 34 F.3d 472 (7th Cir.1994), the Court of Appeals for the Seventh Circuit dismissed an action brought by the EPA on the ground that the agency had failed to exercise alternative remedies before initiating an enforcement action against the operator of a manufacturing plant. The agency alleged that an air permit issued by a county department was not valid because it did not require the defendant to meet certain emissions standards found in Indiana's state implementation plan. The manufacturing plant had implemented modifications immediately after receiving the air permit authorizing them. Months later, the EPA filed an enforcement suit under 42 U.S.C. §§ 7413(a)(5) and (b)(5), alleging that the plant was not operating in compliance with various provisions of the Clean Air Act. The court of appeals held that the EPA should have exercised alternative remedies, such as appealing from the

grant of the permit to an administrative appeals board and, if necessary, obtaining review of the permit in state court. *See id.* at 475. The court stated that it could

> not find in the text of the Clean Air Act, or elsewhere, any indication that Congress expressly or by implication meant to authorize the EPA to mount a collateral attack on a permit by bringing a civil penalty action as many as five years after the permit had been granted and the modification implemented, 28 U.S.C. § 2462, by which time a defendant would have accrued a potential liability in excess of $40 million even though it had been operating under a permit valid on its face and never before challenged. That would be a harsh remedy and we cannot be confident in the absence of any clues that it was one intended to be usable in the circumstances of this case.

*Id.* In dicta, the court noted that it might be unrealistic to expect the EPA to review all air permits within 30 days of their issuance. *See id.* However, the court noted that "[t]he primary responsibility for the Act's enforcement at the level of the individual plant has been lodged in the states rather than in the national EPA, so it would not be surprising if Congress did not equip the EPA with a complete quiver of enforcement arrows." *Id.*

In plaintiff's opinion, *AM General* has no precedential value in this case. Plaintiff argues that in *AM General*, the EPA was acting under 42 U.S.C. § 7413(a)(5) and (b)(3) (formerly 42 U.S.C. § 7413(a)(5) and (b)(5)), which applies when a person constructs or modifies a major stationary source after a finding of non-compliance has been made, whereas in this case, plaintiff is bringing suit under §§ 7413(a)(1) and (b)(1), which applies when a person has violated or is in violation of an implementation plan or permit. The distinction is insignificant. In either circumstance,

plaintiff has an alternative remedy, which is to appeal the issuance of the permit.

It is worth noting that in *AM General*, 34 F.3d 472, there were no allegations that the defendant had withheld necessary information. Instead, the EPA alleged that the county department that issued the permit had overlooked the requirements of the state implementation plan in issuing the permit. The EPA had recommended against the issuance of the permit but the county department rejected the recommendation, perhaps because it had already authorized the defendant to make the requested changes. The defendant had been issued a permit that was valid on its face and had never been challenged before. According to plaintiff, the fact that the source in *AM General* was not alleged to have engaged in any wrongdoing distinguishes *AM General* from this case. Plaintiff asserts that *AM General* does not require exhaustion in this case; plaintiff had no reason to suspect the existence of withheld relevant information that would have alerted it to the possibility that the permit did not conform to the requirements of the state implementation plan or the Clean Air Act. The validity of plaintiff's argument hinges on whether defendant failed to provide all relevant information in its air permit application. So long as defendant did not withhold the information, I find the reasoning of *AM General* persuasive: plaintiff was required to challenge the issuance of the 1992 air permit within 30 days under Wis. Stat. § 285.81(4).

*AM General* raised an issue that the parties do not discuss. The court of appeals noted that in the Seventh Circuit, "it is an unsettled question whether operating under a duly issued permit, albeit one that should not have been issued because it failed to impose requirements found in a state implementation plan, violates that plan." *Id.* at 474. Although the language of the provision under which plaintiff brings these claims, § 7413(a)(1), implies that operating under an improperly issued permit violates the state implementation plan, one district court has held that it does not, see *United States v. Solar Turbines, Inc.*, 732 F.Supp. 535, 539 (M.D.Pa. 1989), and one other circuit court has left the question open, see *Allsteel, Inc. v. EPA*, 25 F.3d 312 (6th Cir.1994). *See* discussion *infra.*

■ In its response to this affirmative defense, plaintiff focuses on 42 U.S.C. § 7413(a)(1). This provision of the Clean Air Act provides for federal enforcement against a facility for violation of the act or any requirement of an applicable state implementation plan. *See* 42 U.S.C. § 7413(a)(1). Plaintiff asserts that it has complied with the requirements of § 7413(a)(1) by issuing a notice of violation to defendant and sending a copy to the state and therefore, that the enforcement statute should apply. When read in isolation, this statute suggests that plaintiff should be able to bring this enforcement action. However, when read alongside Wis. Stat. § 285.81(4), the reach of § 7413 is limited. If plaintiff is unable to prove at trial that the permit at issue is invalid as a result of defendant's acts, plaintiff's action will be barred by the holding in *AM General*, 34 F.3d 472, or by Wis. Stat. § 285.81(4), which provides that air pollution permits are not subject to review in enforcement actions. *See* discussion *infra.*

f. Unenforceability of claims

■ Defendant's sixth affirmative defense rests on its contentions that plaintiff cannot pursue the state law violations alleged in claims one, two and three because the state statutes were not enacted until after defendant had modified its sulfur recovery unit and that plaintiff cannot pursue claim five because that prosecution is

based on state regulations contained in a state program that has expired. (Claim one relates to defendant's construction of an alleged major modification to a major source (its sulfur recovery unit) and continued operation of the source without a valid Prevention of Significant Deterioration permit; claim two relates to defendant's alleged failure to apply the best available control technology in operating its sulfur recovery unit since 1988; and claim three relates to defendant's alleged failure to provide all relevant permit information. Claim five relates to defendant's alleged violation of emissions limits contained in the state's implementation plan; plaintiff alleges that the emissions violate Wis. Admin. Code § NR 154.11(b) (recodified as §§ NR 405.07(1) and NR 405.08(3)) and the Clean Air Act.)

### (1) claims one, two and three

Plaintiff may enforce the provisions of a state implementation plan only after it has given its approval to the plan. Plaintiff concedes that it did not approve Wisconsin's Prevention of Significant Deterioration rules as a revision to the state implementation plan until May 27, 1999, but argues that it may enforce the state regulations against defendant for the violations that continued after May 27, 1999. However, as I have concluded, claims one, two and three do not relate to continuing violations. Therefore, defendant will be granted partial summary judgment on plaintiff's claims under Wis. Admin. Code ch. NR 405 and § NR 406.03.

### (2) claim five

■ In claim five of its complaint, plaintiff alleges that defendant exceeded visible emission limitations "on or after at least June 17, 1998," "in violation of Wis. Admin. Code § NR 154.11(6)b.1. (recodified as Wis. Admin. Code §§ NR 405.07(1) and NR 405.08(3), but not yet approved by the EPA as recodified) and

Section 165(a)(4) of the CAA, 42 U.S.C. § 7475(a)(4)." Defendant contends that plaintiff is barred from bringing any state law claims for violation of visible emissions limitations because § NR 154.11(6)b.1, was no longer part of the state implementation plan, having been repealed before it was recodified in 1986 as § NR 431.04 (not § NR 405.07(1) or § NR 405.08(3)). (§ NR 431.04 requires "[a]ll direct and portable sources on which construction or modification was commenced on or before April 1, 1972" to meet specific emission limits.) Defendant argues that at the time of the alleged violation on June 17, 1998, plaintiff had no legal basis for bringing a state law claim against defendant because § NR 154.11(6)b.1. had been repealed and no approved state implementation provision covering visible emissions existed. In response, plaintiff argues that when it approved the state implementation plan in 1981, the plan included § NR 154.11. Because Wisconsin never asked that the section be removed from the plan, it is still part of the plan and enforceable by plaintiff.

40 C.F.R. § 52.2570(c)(28) indicates that § NR 154.11 was part of the state implementation plan (referring to state's November 27, 1979 submission of implementation plan revision consisting of Wis. Admin. Code § NR 154.11, Control of Particulate Matter). If that section was incorporated into the state implementation plan in such a way that it remained in the plan even after the regulation was repealed and recodified, defendant was obligated to comply with it; otherwise, plaintiff has no authority to sue under that section (or more accurately, under its successor) and the state law claim that defendant violated § NR 154.11(6)b.1 must be dismissed. Determining whether the regulation continues to exist turns on the interpretation of "incorporate by reference" and what that meant for the incorpo-

ration of § NR 154.11 into the state implementation plan. One possible meaning is that the state implementation plan incorporates the indicated regulation by reference, so that as the incorporated regulation changes, the state implementation plan changes with it. Under this interpretation of "incorporate by reference," if the regulation is repealed, it is no longer part of the state implementation plan because there is nothing left to be incorporated by reference.

The other possible meaning is that the state implementation plan incorporates the text of the regulation at the time the plan was approved so that later changes to the regulation do not affect the plan. This second meaning seems more likely to be what plaintiff intended when it approved the state implementation plan; otherwise, the approval process would be largely meaningless because a state could change its regulations after the state implementation plan was approved. *See General Motors Corp. v. United States,* 496 U.S. 530, 540, 110 S.Ct. 2528, 110 L.Ed.2d 480 (1990) ("the approved [state implementation plan] is the applicable implementation plan during the time a [state implementation plan] revision proposal is pending."). Under this second interpretation, which I adopt, § NR 154.11(6)b.1 existed effectively for purposes of the state implementation plan at the time of defendant's alleged violation. Plaintiff may proceed with this claim against defendant under the state implementation plan. Defendant's motion for partial summary judgment to dismiss this portion of claim five will be denied.

g. Wis. Stat. § 285.81(4)

■ One of the purposes of the Clean Air Act is to provide regulated entities with a degree of finality and certainty once regulatory determinations have been made for a facility. Defendant asserts that because regulatory determinations have been made and are included in an air permit or formal applicability determination, Wis. Stat. § 285.81(4) prohibits plaintiff from challenging the terms of the 1992 air permit that authorized defendant to undertake modifications between 1991 and 1993 without obtaining a Prevention of Significant Deterioration permit or implementing the best available technology.

Wis. Stat. § 285.81(4) states that

An air pollution control permit, part of an air pollution control permit or determination by the department under [various sections] is not subject to review in any civil or criminal enforcement action for a violation of this chapter. This subsection does not restrict the ability of a person to challenge an administrative rule as provided in s. 227.40(2).

Defendant asserts that § 285.81(4) leads to the conclusion that plaintiff is prohibited from invalidating the 1990 applicability determination and the 1992 air permit in this enforcement action, especially when the statute is read in conjunction with Wis. Admin. Code § NR 407.14, which requires the department to revise operation permits that contain inaccuracies. According to defendant, these two provisions are the only remedy for correcting an inaccurate permit or determination in Wisconsin's state implementation plan. Because plaintiff approved both of these provisions, defendant argues, the provisions are federally applicable (and binding on plaintiff). Defendant asserts that any enforcement action plaintiff takes under 42 U.S.C. § 7413 is circumscribed by the prohibitions and limitations of the state implementation plan, such as Wis. Stat. § 285.81(4) and NR 407.14.

If it is true that defendant was not responsible for any inaccurate information, defendant's position is persuasive as it applies to the state's 1990 applicability determination and defendant's 1992 air permit. However, this argument does not protect

defendant from enforcement as to the modifications it made to its sulfur recovery unit in 1988. Because defendant was not working under a formal determination or permit at that time, it cannot rely on the protections of § 285.81(4). At the same time, plaintiff carries the burden of establishing that the 1988 modifications were subject to higher standards than defendant was meeting.

In a response similar to the one it made in challenging defendant's failure to exhaust administrative remedies affirmative defense, *see* discussion *supra,* plaintiff maintains that it is entitled to rely on federal law to pursue enforcement of the Clean Air Act and the state implementation plan under 42 U.S.C. § 7413. However, plaintiff fails to address the preclusive effect of Wis. Stat. § 285.81(4). This silence suggests its concession that § 285.81(4) prohibits it from invalidating the 1990 applicability determination and the 1992 air permit in this enforcement action.

Plaintiff's argument that it has authority to enforce the Clean Air Act and state implementation plans is not without precedent. *See General Motors Corp.,* 496 U.S. 530, 537–39, 110 S.Ct. 2528, 110 L.Ed.2d 480 (suggesting that absent unambiguous language otherwise, EPA has authority to enforce Clean Air Act and state implementation plans). Nonetheless, the statute on which defendant relies, Wis. Stat. § 285.81, provides in unequivocal terms that permits and determinations are not subject to review.

■■■ As the court noted in *AM General,* 34 F.3d at 474, it is an open question in this circuit whether an entity violates the state implementation plan if it operates under a permit that is valid on its face but fails to impose requirements found in the plan. If it becomes necessary to reach that question, I am inclined to conclude that the answer should be no, for the following reasons: Wis. Stat. § 285.81 is unambiguous as to the review of permits and determinations; plaintiff has offered no grounds for not applying § 285.81; plaintiff had the opportunity to challenge the permit immediately after its issuance in 1992; and to answer otherwise would be a harsh outcome for defendant that has been relying on its 1992 air permit for years. It follows that operating under a duly issued permit that is valid on its face does not constitute a violation of the state implementation plan even if the permit should not have been issued because it failed to impose the requirements of the plan.

h. Comparison of pre-improvement and post-improvement emissions

■■■ Although neither party has provided a helpful explanation of the significance of pre-improvement and post-improvement emissions, each party disputes the other's method of determining whether Prevention of Significant Deterioration standards apply to the sulfur recovery unit and No. 2 distillate unifier projects. Defendant contends that plaintiff's determination relies on an incorrect comparison between pre-improvement and post-improvement emissions. Defendant concedes that plaintiff's comparison of defendant's *actual* emissions before the projects to its *potential* emissions after the projects would be proper if the projects were new construction of sources. It argues, however, that this comparison is out of place in this situation in which changes were made to an existing sulfur recovery unit. The unit had "begun normal operations" before the changes were made.

Prevention of Significant Deterioration regulations require preconstruction review for sources undertaking a major modification. *"Major modification* means any physical change in or change in the meth-

od of operation of a major stationary source that would result in a significant net emissions increase of any pollutant subject to regulation under the [Clean Air] Act." 40 C.F.R. § 52.21(b)(2)(i).

*Net emissions increase* means the amount by which the sum of the following exceeds zero:

(a) Any increase in actual emissions from a particular physical change or change in method of operation at a stationary source; and

(b) Any other increases and decreases in actual emissions at the source that are contemporaneous with the particular change and are otherwise creditable.

40 C.F.R. § 52.21(3)(i).

"Actual emissions" is defined as follows:

(21)(i) *Actual emissions* means the actual rate of emissions of a pollutant from an emissions unit, as determined in accordance with paragraphs (b)(21)(ii) through (iv) of this section.

(ii) In general, actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant during a two-year period which precedes the particular date and which is representative of normal source operation. The Administrator shall allow the use of a different time period upon a determination that it is more representative of normal source operation. Actual emissions shall be calculated using the unit's actual operating hours, production rates, and types of materials processed, stored, or combusted during the selected time period.

. . .

(iv) For any emissions unit (other than an electric utility steam generating unit specified in paragraph (b)(21)(v) of this section) which has not begun normal operations on the particular date, actual emissions shall equal the potential to emit of the unit on that date.

40 C.F.R. § 52.21(b)(21).

Defendant would prefer a comparison of *actual* emissions before and after the projects because it believes that such a comparison would show that the projects reduced sulfur dioxide emissions from the refinery. Defendant reaches this conclusion by comparing total emissions from all components of the refinery before and after the sulfur recovery unit and No. 2 distillate unifier projects. In its view, an actual-to-actual comparison is appropriate because the 1988 and 1991 improvements did not change the sulfur recovery unit enough to support a finding that normal operations had not begun before the improvements.

Plaintiff denies that the post-improvement sulfur recovery unit had begun normal operations before the improvements were made. This raises the question how plaintiff ever obtains *actual* emissions from facilities before they have begun "normal operations." One would think that plaintiff would be limited to comparing *potential* emissions pre-improvement *and* post-improvement whenever it is working with either a new project or one that is going to be modified significantly.

Defendant cites *Wisconsin Electric Power Co. v. Reilly,* 893 F.2d 901 (7th Cir.1990), to support its assertion that because there was little uncertainty as to the quantity of sulfur dioxide that would be emitted from its sulfur recovery unit after the modifications, an actual-to-actual comparison of emissions should be performed. In *Reilly,* Wisconsin Electric challenged the defendant EPA administrator's final determination that a proposed replacement program designed to increase the life of steam generating units was subject to Prevention of Significant Deterioration requirements. The court described the

changes at the plant as "like-kind replacement," meaning that deteriorated generating systems were replaced with similar new equipment without changing the original design of the systems. The court addressed the propriety of a comparison between actual pre-renovation emissions with potential post-renovation emissions. *See id.* at 915–918. The plaintiff had based its post-renovation "potential to emit" figures on around the clock operations, even though Wisconsin Electric had never operated continuously in the past. The defendant admitted that it assumed an increase in emissions would result from increases in production rate or hours of operation and not from an increase in emission rate. The court set aside the defendant's determination that there had been a major modification for Prevention of Significant Deterioration purposes because the defendant's "reliance on an assumed continuous operation as a basis for finding an emissions increase is not properly supported." *Id.* at 918.

In a document issued in 1991, plaintiff proposed amendments clarifying the application of the new source regulations to electric utility generating units and addressed the concerns raised by the court of appeals in *Reilly. See* 56 Fed.Reg. 27630 (Jun. 14, 1991). In that document, plaintiff "propos[ed] to revise its regulations to apply the actual-to-actual test on all physical or operational changes at electric utility steam generating units save those that are an addition of a new unit or constitute a replacement of an existing unit." *Id.* at 27633. Plaintiff proposed the regulations in response to the courts' conclusions in *Reilly* and *Puerto Rican Cement Co., Inc. v. United States EPA,* 889 F.2d 292 (1st Cir.1989) that "under its current regulations, EPA must consider the facts of each case and apply the actual-to-potential test only where the change is sufficiently significant to support a finding that 'normal operations' have not 'begun.' At least for

changes that are 'like kind replacements,' 'normal operations' have begun, and the actual-to-potential test is impermissible." 56 Fed.Reg. at 27633; 57 Fed.Reg. 32314, 32317 (July 21, 1992). The regulations were promulgated in 1992 and "appl[ied] the actual-to-actual test on all physical or operational changes at electric utility steam generating units save those that are an addition of a new unit or constitute a replacement of an existing unit." 57 Fed. Reg. 32314, 32317 (July 21, 1992).

*Reilly* is distinguishable from the present case because defendant increased the capacity of the sulfur recovery unit and made other functional changes to the unit. In contrast, Wisconsin Electric simply replaced old pieces of equipment with new equivalents. In addition, both the ruling in *Reilly* and plaintiff's comments in the Federal Register relate to electric utility steam generating units. They cannot be applied directly to defendant's sulfur recovery unit. The rule changes were based on plaintiff's determination that only certain changes to components of electric utility steam generating units had sufficiently predictable consequences to allow use of a "future actual" prediction. The parties have not cited any regulation that would apply a similar test to a sulfur recovery unit; therefore, the relevant question is whether defendant's improvements to the unit were sufficiently significant to support a finding that normal operations had not begun before the improvements. If normal operations had not begun, an actual-to-potential test applies; otherwise, an actual-to-future-actual prediction is appropriate.

Unfortunately, the regulations provide no guidance on how to determine whether a source had begun normal operations. Defendant argues that the modifications made no change in the method of operation of the sulfur recovery unit but cites no

authority for the proposition that a change in the method of operation is the deciding factor in determining whether normal operations had begun. Both parties agree that the pre-construction unit had begun normal operations before each set of changes. Using a literal definition of "normal operations," I conclude that each set of the changes was significant enough to make the post-construction unit effectively a new unit that had not begun normal operations at the start of construction. For example, in 1988, defendant installed a larger combustion chamber in the sulfur recovery unit and in 1991, defendant increased the sulfur pit and the heat exchange surface of the waste heat boiler and added deeper sulfur seal legs, among other things. In each case, the post-improvement unit was different enough from the pre-improvement unit that the post-improvement unit could not be said to have begun normal operations before the improvements were made. Defendant did not simply replace old parts with equivalent new ones.

In its reply brief, defendant changes tactics to argue that if the unit had not begun normal operations, a "potential-to-potential" test should apply. This test makes no practical sense; if any change in a unit meant that a pre-improvement unit had not begun normal operations such that 40 C.F.R. § 52.21(21)(iv) applied, the general definition given in § 52.21(21)(ii) looking at average emissions actually emitted for the two years preceding the change would never come into effect. This reading is contrary to the fact that § 52.21(21)(ii) begins, "In general," indicating that it was to be applied in the majority of cases.

 Plaintiff notes that defendant's suggestion that plaintiff perform an actual-to-actual comparison would have been impossible had defendant applied for a Prevention of Significant Deterioration permit before construction as required by the Clean Air Act. This is not entirely correct. Although defendant's application of an actual-to-actual comparison uses the emissions that actually resulted after the modifications, the actual-to-actual test as described by plaintiff in the Federal Register is a prediction of what the actual emissions will be after the modification. Such prediction can be made before a modification. Assuming that defendant is arguing for a "past actual-to-future actual prediction" test, its argument is unconvincing. Defendant has pointed to no authority for such a test's application to changes to a sulfur recovery unit. Although the "actual-to-potential" test may not be the fairest measure of emissions increases, defendant has failed to cite any legal authority that would support a different test in this case. Courts grant substantial deference to an agency's reasonable interpretation of its regulations; I cannot say that plaintiff's interpretation of the applicable test is unreasonable.

I conclude that the "actual-to-potential" test is appropriate to determine whether defendant is subject to Prevention of Significant Deterioration standards. Defendant's motion for partial summary judgment on the ground that plaintiff made incorrect comparisons of pre-improvement and post-improvement emissions will be denied.

Defendant makes related arguments in responding to plaintiff's motion for summary judgment on the issue whether defendant's modifications in 1988 and 1991 triggered the Prevention of Significant Deterioration regulations. Because the statute of limitations may bar the application of the standards, it is not useful to determine whether plaintiff has adduced evidence sufficient to warrant the grant of summary judgment on this point if application of the statute of limitations was not at

issue. However, I note that the parties' dispute does not appear to be the factual issue of what the emissions were before and after the modifications, but instead is a legal dispute about how to measure emissions and whether the entire refinery's emissions may be considered in establishing the pre-construction baseline.

i. Design capacity of sulfur recovery unit

Asserting still another reason to dismiss one or more of plaintiff's first four claims, defendant contends that claim four must be dismissed because its sulfur recovery unit never reached the level at which New Source Performance Standards applied to it; therefore, defendant cannot be held to have violated those standards. The parties agree that 20 long tons of sulfur a day is the critical quantity that triggers application of the New Source Performance Standards. However, they disagree whether the measurement is *production* or *input.* Plaintiff has taken different positions over the years. For example, plaintiff states in its brief in support of its motion for summary judgment, dkt. # 37, at 66: "Specifically, the 20 [long tons per day] exemption in [new source performance standards] Subpart J applies to the Claus [sulfur recovery unit]'s actual sulfur *production* or its sulfur *input* capacity." However, in the preamble to the new source performance standards of subpart J of 40 C.F.R. part 60 that were published in 43 Fed.Reg. 10,868 (Mar. 15, 1978), plaintiff wrote that the standards of performance for new stationary sources, 40 C.F.R. part 60, apply to "any Claus sulfur recovery plant with a sulfur *production* capacity of more than 20 [long tons per day]," 43 Fed.Reg. at 10866 (Mar. 15, 1978) (emphasis added), and that "Claus sulfur recovery plants with a sulfur *production* capacity of 20 long tons per day or less ... are exempt from the standards." 43 Fed.Reg. at 10867 (emphasis added). In the New Source Performance Standards subpart J, amended on October

25, 1979, plaintiff ruled that a sulfur recovery unit was subject to the standards if it had a *processing capacity* of more than 20 long tons a day. *See* 44 Fed.Reg. 61,542 (Oct. 25, 1979). ("Processing capacity" is a reference to the unit's ability to process a certain amount of input.) Adding more confusion is a memorandum issued on October 22, 1992, by John Rasnic, plaintiff's Director, Stationary Source Compliance Division, Office of Air Quality and Standards, in which Rasnic stated,

> This memorandum amends the June clarification to make the 20 [long tons per day] exemption under [new source performance standards] Subpart J more practicable. The June 2, 1992 memorandum stated that the [long tons per day] applicability exemption refers to the amount of sulfur which a Claus plant is designed to produce. A definition of [long tons per day] based upon output would allow exemptions for inefficient, and thus low sulfur-producing facilities. Applicability based upon output would also apply differently to similar units depending on performance, and penalize efficient control devices with higher sulfur recovery. A definition based upon feed rate and amount of sulfur input is more logical than a definition based upon the output.

> Therefore, long tons per day means the design capacity of a Claus sulfur recovery plant based upon feed rate and content of hydrogen sulfide (expressed as sulfur) in the acid gas stream.

Plt.'s Summ. J. and Proposed Findings Exhs., dkt. # 52, at Exh. SJM 15.

Because plaintiff contends that it can establish that defendant's sulfur recovery unit exceeded 20 long tons a day in both input and production and defendant contends that it can prove that it did not exceed the limit in either respect, I see no need to determine at this time what stan-

dard plaintiff had in place at the relevant times, whether that standard had been communicated to the public through a rule-making process and if not, whether principles of due process preclude the application of the standard to defendant's unit as of 1988 and 1991. If developments at trial make it necessary to answer these questions, I will take them up after trial.

2. *Merits of Clean Air Act claims*

a. Claims one through four

As the preceding discussion establishes, resolving the merits of plaintiff's first four claims depends on determining what happened when defendant modified its sulfur recovery unit in 1988 and 1992 and particularly, determining whether defendant provided the Wisconsin Department of Natural Resources all of the information required of it. Because those determinations require the resolution of disputed issues of fact, they cannot be made until trial. Plaintiff's motion for partial summary judgment will be denied as to these claims.

b. Claim five: visible emissions limits

 Plaintiff's claim five rests entirely on readings taken by its employee, Margaret Sieffert, on June 17, 1998. Sieffert acknowledges that she took the readings without preparation, without a copy of the Visible Emissions Observation Form and without a compass to determine directions and that she prepared the required form five days after she took the readings, when she returned to her office. She admits that she had to rely on her memory for some of the information because it was not included in her notes, that she was mistaken in her understanding of where north was when she took the readings and that she had been confused about directions when she was at defendant's refinery.

Although I have serious concerns about the reliability of Sieffert's report, I am not prepared to discount it without an opportunity to learn more about it at trial. The lack of a compass raises a question about Sieffert's ability to determine exactly where she was to stand to make her observations in relation to the alleged pollution source and the sun. Both parties agree that getting the location exactly right is critical to the accuracy of the observations. Another point that gives me pause is Sieffert's attempting to remember what she had observed five days earlier in Superior. The absence of the form left Sieffert at a disadvantage on July 17; she did not think at the time of her observations to write down everything the form required. It may be that on June 22, when she did have the form in front of her, she was able to remember everything she had observed at the time but I am not yet persuaded of this, particularly in light of the mistakes that she did make. Also, I am troubled by the government's willingness to proceed on the basis of a report made without the proper form and basic tools. According to the record, plaintiff was at the Superior refinery site through June 19, 1998. Plaintiff has not suggested any reason it could not have obtained a copy of the appropriate form by facsimile or electronic mail and purchased the basic tools for observation in a hardware store in Superior before undertaking an observation that would meet the requirements of its own reference method. However, I will reserve a decision on the merits of the claim until I have had the opportunity to hear Sieffert and the other witnesses at trial.

c. Claim 6: volatile organic compound emissions

 Wisconsin's state implementation plan includes § NR 420.05(4), which regulates volatile organic compound emissions from existing components at petroleum refineries. (These compounds react with nitrogen oxides and oxygen in the presence

of sunlight to form ozone.) The regulation is designed to prevent certain emissions of these compounds by imposing strict requirements on the routine identification, monitoring and repair of each valve, pump and compressor in service, using a specified procedure.

Among the requirements § NR 420.05(4) imposes is one mandating the sealing of open ends of lines with a second valve, a blind flange, a plug or a cap. During the time of inspection, June 15–19, 1998, defendant's refinery had 16 separate line ends in violation of this requirement. During the same time, there were 49 instances in which defendant did not comply with the provision requiring visible marking of pipeline valves or pressure relief valves in gaseous service. On at least 16 occasions in 1995, 15 occasions in 1996 and 10 occasions in 1997, defendant did not fix components leaking at a rate of 10,000 ppm within 15 days, as required under § NR 420.05(4)(c)4.c.

Reference Method 21, 40 C.F.R. Pt. 60, App. A, Meth. 21, applies to the determination of volatile organic compound leaks from process equipment. Defendant is required to use Reference Method 21, which directs that the monitoring instrument be placed at the interface where leakage could occur from the monitored component, or within one centimeter if the source is a rotating shaft of a pump or compressor. *See id.* § 4.3.1. The probe must remain at the location of the maximum instrument reading for approximately two times the instrument response time. *See id.* The pronounced differences in the monitoring results that plaintiff obtained compared to those found by defendant and its contractor are evidence that defendant was not conducting regularly scheduled monitoring in accordance with Reference Method 21.

Defendant's defense to this claim is primarily to argue that plaintiff's inspectors were inexperienced and that variances in some of the numbers reported cast doubt on the accuracy of the observations. These arguments are unconvincing, particularly in light of defendant's failure to put into dispute the essential findings the inspectors made, usually in the presence of defendant's contractor and with the contractor's concurrence in the finding. In several instances, defendant challenges the importance of the observed violations, arguing, for example, that the existence of a leak is not evidence of a serious emission into the atmosphere or that the absence of tags on certain valves does not mean that the environment is at risk. These arguments do not controvert the findings but go to the significance of the violations. They are better suited to the damages phase of the trial.

I conclude that plaintiff is entitled to partial summary judgment on this claim.

### B. *Clean Water Act Claims (7–13)*

■ The Clean Water Act is intended to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The act prohibits the discharge of any pollutant into navigable waters of the United States except in compliance with a National Pollutant Discharge Elimination permit issued by plaintiff. *See* 33 U.S.C. §§ 1311, 1342. The state may be authorized to implement and enforce the Clean Water Act. *See* § 1342(b). Plaintiff has authorized Wisconsin to administer the National Pollutant Discharge Elimination System permit program for discharges into navigable waters within its jurisdiction through the Wisconsin Pollutant Discharge Elimination System, a program supervised by the Wisconsin Department of Natural Resources. *See* Wis. Stat. § 283.31. The permits issued under the Wisconsin Pollutant Discharge Elimination System use ef-

fluent limitations to control discharges into navigable waters. *See id.*

Under the Clean Water Act, each permittee must establish and maintain records, install and use monitoring equipment, sample its effluent according to a prescribed schedule and report the results to the permitting agency. *See* 33 U.S.C. § 1318(a); 40 C.F.R. ·§§ 122.41(j)(3), 122.48, 123.25. The effluent reports, which are submitted on standard EPA prescribed forms, are known as Discharge Monitoring Reports. *See* 40 C.F.R. §§ 122.2, 123.25. A permittee's Discharge Monitoring Reports must be signed by a "responsible corporate officer" or duly authorized representative, who certifies that the reported information was prepared by qualified personnel under his or her direction or supervision, and that the information is true, accurate and complete. 40 C.F.R. § 122.22. Accuracy is further encouraged by the availability of criminal penalties for false statements. *See* 33 U.S.C. § 1319(c)(2).

The parties agree that (1) Newton Creek and Lake Superior are "navigable waters" within the meaning of the Clean Water Act, *see* 33 U.S.C. § 1362(7), and are "waters of the United States" within the meaning of 40 C.F.R. § 122.2; (2) defendant has discharged "pollutants" within the meaning of the Clean Water Act, *see* 33 U.S.C. § 1362(6), into Newton Creek and Lake Superior through Outfall 001; (3) Outfall 001 is a "point source" within the meaning of the Clean Water Act, *see* 33 U.S.C. § 1362(14) and 40 C.F.R. § 122.2; and (4) the industrial wastewater discharged by defendant contains "pollutants" within the meaning of the Clean Water Act, see 33 U.S.C. § 1362(6), including chlorides, total recoverable selenium and phosphorus.

In claim seven, plaintiff alleges that defendant discharged chloride in excess of the weekly limit contained in its modified Wisconsin Pollutant Discharge Elimination System permit at various times during March 1996, March 1997 and April 1997. In claim eight, plaintiff alleges that defendant discharged selenium in excess of the weekly limit contained in its modified Wisconsin Pollutant Discharge Elimination System permit at various times in July 1996 and February 1998. In claim nine, plaintiff alleges that defendant discharged phosphorus in excess of the limit contained in its modified Wisconsin Pollutant Discharge Elimination System permit during April and May 1998. In claims seven, eight and nine, plaintiff seeks relief under 33 U.S.C. § 1311, alleging that defendant discharged chloride, selenium and phosphorous in excess of the relevant limits for a total of 99 days. Both parties have moved for summary judgment on claims seven and eight; plaintiff has moved for summary judgment on claim nine. Plaintiff's motion for summary judgment on claim nine will be granted because defendant concedes that "it exceeded the 12–month rolling average for phosphorous on the two occasions cited at par. 237 of the Amended Complaint, and Murphy will not contest the Ninth Claim." Dft.'s Br. Opp. Plt.'s M. Partial Sum. J, dkt. # 98, at 157.

*1. Defendant's motion for summary judgment on claims seven and eight*

There are two avenues for challenge to a permit under Wisconsin law: a request for a variance pursuant to Wis. Stat. § 283.15 and a petition for review of the requirements in the permit pursuant to Wis. Stat. § 283.63. Defendant pursued both avenues of relief following the department's issuance of Permit No. WI–0003085–5. Defendant's sole argument in support of its summary judgment motion on claims seven (excessive chloride discharges) and eight (excessive selenium discharges) is that the chloride and selenium limitations contained in Permit No. WI–

0003085–5 were not in effect during the relevant time periods because they were the subject of a stay imposed by Wis. Stat. § 283.63(1)(am) as a result of defendant's petition for review. Defendant's position is that the stay of the limits set by the challenged provisions was unaffected by the department's modification of the permit in 1994. Plaintiff responds that defendant's challenge to Permit No. WI–0003085–5 under § 283.63 was rendered moot when the department reissued the permit with modifications in August 1994.

The variance provision, Wis. Stat. 283.15(2)(a), provides that

(1) When the department issues, reissues or modifies a permit to include a water quality based effluent limitation under s. 283.13(5), the permittee may apply to the department for a variance from the water quality standard used to derive the limitation.

(2) After an application for a variance is submitted to the department, and until the last day for seeking review of the secretary's final decision on the application or a later date fixed by order of the reviewing court, the water quality based effluent limitation under s. 283.13(5) and the corresponding compliance schedule are not effective. All other provisions of the permit continue in effect except those for which a petition for review has been submitted under s. 283.63.

"[T]he secretary shall approve all or part of a requested variance, or modify and approve a requested variance if the permittee demonstrates, by the greater weight of the credible evidence, that attaining the water quality standard is not feasible because" of such things as naturally occurring pollutant concentrations, physical conditions or human caused conditions. Wis. Stat. § 283.15(4).

The petition for review provision, Wis. Stat. § 283.63(1), provides that

Any ... permittee ... may secure a review by the department of ... the reasonableness of or necessity for any term of condition of any issued, reissued or modified permit ... any water quality based effluent limitation established under s. 283.13(5).

(am) After a verified petition for review is filed and until the last day for seeking review of the department's decision or a later date fixed by order of the reviewing court, any term or condition, thermal effluent limitations or water quality based effluent limitation which is the subject of the petition is not effective. All other provisions of the permit continue in effect except those for which an application for a variance has been submitted under s. 283.15.

The Wisconsin statutory framework for challenges to permits contemplates explicitly that a permit holder may file both an application for a variance pursuant to Wis. Stat. § 283.15 and a petition for review pursuant to Wis. Stat. § 283.63. *See* Wis. Stat. § 283.15(9) ("If the secretary approves part or all of a variance or modifies and approves the variance under this section and the department issues a modified water quality based effluent limitation under s. 283.63 for the same substance, the permittee shall comply with the least stringent of the 2 effluent limitations."); § 283.63(1)(am) ("All other provisions of the permit continue in effect except those for which an application for a variance has been submitted under s. 283.15"); § 283.63(4). Wis. Stat. § 283.63(4) is the key provision underlying the parties' disagreement whether defendant's challenge under § 283.63 remained open and unresolved after the department reissued Permit No. WI–0003085–5 with modifications in 1994. Section 283.63(4) states that "Subsections (1) and (2) do not apply to the modification of a permit which implements a decision under s. 283.15 or the denial of a

request for a variance under s. 283.15." Defendant reads this section to mean that its petition for review under § 283.63 was viable and the stay of the challenged provisions remained in effect following the department's reissuance of the permit because it could not have brought a § 283.63 challenge to the department's decision to modify Permit No. WI–0003085–5. According to defendant, its challenge to the original version of Permit No. WI–0003085–5 under § 283.63 remained unresolved until the department reissued its permit in 1999 and, as a result, plaintiff cannot enforce the limitations contained in Permit No. WI–0003085–5.

I am persuaded that a more natural reading of Wis. Stat. § 283.63(4) precluded defendant from continuing to pursue a petition for review under § 283.63 on the chloride and selenium limitations after it was successful in securing a variance under § 283.15. When the department modified Permit No. WI–0003085–5 in 1994, it modified the acceptable limits for selenium and chloride and replaced the limits in the original permit, thereby rendering moot any challenge to the original limits. Defendant's position is illogical and contrary to the purposes of the Clean Water Act. It would allow a permit holder to take advantage of the alternative avenues of review as a way to stay the effectiveness of any challenged portions of a permit despite final resolution of one of the avenues of review. Allowing defendant to escape limitations for the discharge of chloride and selenium into Newton Creek and Lake Superior following the successful resolution of its request for a variance would contravene the public policy behind the Clean Water Act's regulation of the discharge of pollutants into navigable waters. I conclude that defendant's petition for review of Permit No. WI–0003085–5 did not stay the enforceability of its provisions following the modification of the permit in 1994. Accordingly, defendant's motion for summary judgment on claims seven and eight will be denied.

2. *Plaintiff's motion for summary judgment on claims seven, eight and nine*

■ Defendant does not respond to the merits of plaintiff's claims seven and eight. Instead, defendant rests its opposition to defendant's motion on its argument that the chloride and selenium limitations contained in Permit No. WI–0003085–5 were not in effect during the relevant time periods because they were the subject of a stay imposed by Wis. Stat. § 283.63(1)(am) as a result of defendant's petition for review. Plaintiff's position is that it is entitled to summary judgment on claims seven and eight because defendant's discharge monitoring reports establish that defendant exceeded the permit limitations for chloride and selenium. I agree.

In *Sierra Club v. Union Oil Co. of California*, 813 F.2d 1480, 1492 (9th Cir.1987), the Court of Appeals for the Ninth Circuit stated that self-monitoring reports under the National Pollutant Discharge Elimination System are "conclusive evidence of an exceedance of a permit limitation." The court noted that the regulations, such as 40 C.F.R. §§ 122.41(j), (k) (establishing numerous requirements for self-monitoring and reporting), and the legislative history of the act "support the conclusion that accurate reports are critical to effective operation of the Act." *Id.* Specifically, the Act's legislative history states,

[T]he bill ... establishes and makes precise new requirements imposed on persons and subject to enforcement. One purpose of these requirements is to avoid the necessity of lengthy fact finding, investigations at the time of enforcement. Enforcement of violations of requirements of this Act should be based on relatively narrow fact situa-

tions requiring a minimum of discretionary decision making or delay.

S.Rep. No. 414, 92nd Cong., 1st Sess. 64, *reprinted in* 1972 U.S. Code Cong. & Ad. News 3668, 3730. *See Chesapeake Bay Foundation v. Bethlehem Steel Corp.,* 608 F.Supp. 440, 451 (D.C.Md.1985) ("The conclusion that [Discharge Monitoring Reports] may be used to establish liability is consistent with the legislative history and avowed policy of the Act.")

■ "In an enforcement action, a defendant's [Discharge Monitoring Reports] constitute admissions regarding the levels of effluent that the defendant has discharged. If the [Discharge Monitoring Reports] show that the defendant has exceeded its [National Pollutant Discharge Elimination System] permit limitations, then permit violations are established." *United States v. City of Hoboken,* 675 F.Supp. 189, 192 (D.N.J.1987). *See also Student Public Interest v. Fritzsche, Dodge & Olcott,* 579 F.Supp. 1528, 1538–39 (D.N.J.1984) (same). Plaintiff's motion for summary judgment on defendant's liability for claims seven and eight will be granted because defendant's Discharge Monitoring Reports show that its discharge of chlorides exceeded the permissible weekly average contained in its modified permit during the periods of March 8–14, 1996; March 22–28, 1997; and April 1–7, 1997 and its discharge of selenium exceeded the permissible weekly average contained in its modified permit during the periods of July 29–31, 1996; February 8–14 and 15–21, 1998. *See Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 174, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) ("Noncompliance with a permit constitutes a violation of the [Clean Water Act].")

■ Under the Clean Water Act, a violation of a weekly average limitation constitutes a violation for each day of the weeks in question and a violation of a monthly average limitation constitutes a violation for each day of the months in question. *See Atlantic States Legal Foundation v. Tyson Foods, Inc.,* 897 F.2d 1128, 1139 (11th Cir.1990); *Chesapeake Bay Foundation v. Gwaltney of Smithfield Ltd.* 791 F.2d 304, 314 (4th Cir.1986), *rev'd on other grounds; Atlantic States Legal Foundation v. Universal Tool,* 786 F.Supp. 743 (N.D.Ind.1992); *Public Interest Research Group of New Jersey v. Star Enterprise,* 771 F.Supp. 655, 668 (D.N.J. 1991). I agree with the reasoning set forth by the Fourth Circuit in *Chesapeake Bay,* 791 F.2d at 314,

> While the statute does not address directly the matter of monthly average limitations, it does speak in terms of penalties per *day* of violation, rather than penalties per *violation.* This language strongly suggests that where a violation is defined in terms of a time period longer than a day, the maximum penalty assessable for that violation should be defined in terms of the number of days in that time period.

Therefore, at trial, defendant will be assessed damages for a total of 99 days for which it exceeded the permissible discharges for chlorides (21 days), selenium (17 days) and phosphorous (61 days).

3. *Plaintiff's motion for summary judgment on claims ten, eleven, twelve and thirteen*

■ In claim ten, plaintiff alleges that defendant failed to timely implement an amendment to its spill containment and countermeasure plan by failing to provide a sufficient secondary containment area for slop oil tanks S–1 and S–2. (Plaintiff is seeking damages only and not injunctive relief for claim ten because defendant has installed a sufficient secondary diked containment area. *See* Plt.'s Proposed Findings of Fact # 451, n.4, dkt. # 65; Plt.'s Br. M. Sum. J., dkt. # 37, at 82 n.36.) In

claim eleven, plaintiff alleges that defendant failed to timely implement an amendment to its spill containment and countermeasure plan by failing to provide sufficient capacity for the common diked area for Tanks 21, 22 and 23. In claim twelve, plaintiff alleges that defendant failed to provide adequate secondary containment volume for Tank 57. In claim thirteen, plaintiff alleges that defendant failed to have its November 1996 and June 1997 amendments to its spill containment and countermeasures plan certified by a professional engineer.

 The Clean Water Act prohibits the discharge of oil or hazardous substances into or upon the navigable waters of the United States or adjoining shorelines in such quantities that have been determined may be harmful to the public health or welfare or environment of the United States. *See* 33 U.S.C. § 1321(b)(3). Pursuant to the Clean Water Act, the Environmental Protection Agency has promulgated the Spill Prevention Control and Countermeasures regulations, *see* 40 C.F.R. Part 112, which "establish[ ] procedures, methods and equipment and other requirements for equipment to prevent the discharge of oil from non-transportation related onshore and offshore facilities into or upon the navigable waters of the United States or adjoining shorelines." 40 C.F.R. § 112.1(a). The Spill Prevention Control and Countermeasures regulations apply "to owners or operators of non-transportation-related onshore and offshore facilities engaged in drilling, producing, gathering, storing, processing, refining, transferring, distributing or consuming oil and oil products, and which, due to their location, could reasonably be expected to discharge oil in harmful quantities ... into or upon the navigable waters of the United States or adjoining shorelines." 40 C.F.R. § 112.1(b).

Section 112.7 sets forth the "Guidelines for the preparation and implementation of a Spill Prevention Control and Countermeasure Plan." Specifically, § 112.7 provides that "[t]he SPCC Plan shall be a carefully thought-out plan, prepared in accordance with good engineering practice.... The complete SPCC Plan shall ... include a discussion of the facility's conformance with the appropriate guidelines." 40 C.F.R. § 112.3(a). Under 40 C.F.R. § 112.7(e)(2)(ii), the plan should discuss conformance with the requirement that "[a]ll bulk storage tank installations should be constructed so that a secondary means of containment is provided for the entire contents of the largest single tank plus sufficient freeboard to allow for precipitation." Section 112.7(e)(2)(ii) excludes "production facilities" from its coverage. "After the plan is prepared, it is to be "fully implemented" as soon as possible." 40 C.F.R. § 112.3(a)

Owners and operators of facilities that are required to prepare a plan "shall complete a review and evaluation of the SPCC Plan at least once every three years," 40 C.F.R. § 112.5(b), and "shall amend the SPCC Plan ... whenever there is a change in facility design, construction, operation or maintenance which materially affects the facility's potential for the discharge of oil into or upon the navigable waters of the United States or adjoining shore lines. Such amendments shall be fully implemented as soon as possible, but not later than six months after such change occurs." 40 C.F.R. § 112.5(a).

The parties agree that (1) defendant is the "owner or operator" of an "onshore facility" that is "non-transportation related;" (2) the refinery is subject to the spill prevention control and countermeasure regulations; and (3) defendant was required to prepare a written spill prevention control and countermeasure plan.

Although the parties agree that slop oil tanks S–1 and S–2 did not have sufficient containment areas at the time of the 1998 inspection, plaintiff's motion for summary judgment on claim ten will be denied because the parties disagree whether tanks S–1 and S–2 are bulk storage tanks (subject to 40 C.F.R. § 112.7(e)(2)(ii)) or production tanks (exempted from § 112.7(e)(2)(ii)) and whether defendant delayed installation in anticipation of the Wisconsin Department of Natural Resources' closure of the site. Plaintiff's motion for summary judgment on claims eleven and twelve will be denied because there are material facts in dispute whether within six months of defendant's 1996 plan: (1) the diked area for tanks 21, 22 and 23 had sufficient containment for the contents of the largest single tank, plus sufficient freeboard for precipitation and (2) the volume of the secondary containment area for Tank 57 was sufficient to allow for precipitation. Although the parties agree that defendant failed to have its November 1996 and June 1997 amendments certified by a professional engineer, plaintiff's motion for summary judgment on claim thirteen will be denied because plaintiff failed to provide sufficient facts to establish that defendant's amendments required such approval pursuant to 40 C.F.R. § 112.5(c).

C. *Resource Conservation and Recovery Act Claims (14–21)*

1. *Defendant's affirmative defense*

■ Defendant challenges the Resource Conservation and Recovery Act claims against it on the ground that plaintiff is barred from suing it under the act because the state has begun its own action against defendant and the act does not permit independent prosecutions by both the state and federal government. Defendant's assertion of preclusion brings to the forefront the Eighth Circuit's decision in *Harmon Industries, Inc. v. Browner*, 191 F.3d 894 (8th Cir.1999). Defendant rests

its challenge entirely on that case. With one exception, the case is directly on point. The exception is a significant one. In *Harmon Industries*, the state had entered into a consent decree with Harmon Industries and the decree had been approved by a state judge. In this case, by contrast, the state has done no more than initiate an action against defendant under the Resource Conservation act after plaintiff filed its own complaint. The state case has been stayed; no judgment on the merits or consent judgment has been approved and no settlement has been agreed to between the parties. This difference does not obviate the need to discuss the issue because defendant takes the position that even the filing of a suit by a state agency forecloses the federal government from prosecuting.

In *Harmon Industries*, the plaintiff company notified the Missouri Department of Natural Resources that its maintenance workers had been discarding solvent residue outside one of the plaintiff's plants for many years. Harmon Industries reached an agreement, later approved by a state court, under which it would clean up the disposal area and pay no fine. While it was implementing the cleanup, the EPA initiated an enforcement proceeding against it under the Resource Conservation act, seeking over $2 million in penalties. Harmon Industries litigated the EPA claim before an administrative law judge, who upheld the imposition of the penalty, although it reduced the amount. After an appeals panel upheld both the imposition of the penalty and the amount, Harmon Industries challenged the decision in federal district court, which found that the imposition of a civil penalty violated the Resource Conservation act. The court of appeals affirmed the district court's decision, holding that the EPA was barred from initiating an independent action against an alleged violator of the Resource

Conservation act that had been the subject of a state enforcement action.

The court of appeals began its analysis with a review of the act, which, like the Clean Air Act ·and the Clean Water Act, permits states to apply to the EPA for authorization to administer and enforce a program, in this case, a hazardous waste program. If authorization is granted, the "state is authorized to carry out such program in lieu of the Federal program under this subchapter ... and to issue and enforce permits for the storage, treatment, or disposal of hazardous waste." 42 U.S.C. § 6926(b). In another subsection, § 6926(d), the statute provides that "[a]ny action taken by a State under a hazardous waste program authorized under the [Resource Conservation act] [has] the same force and effect as action taken by [the EPA] under this subchapter." Once the EPA grants authorization, it cannot be rescinded unless the EPA finds that the state program is inadequate or is failing to enforce compliance with the federal law, see § 6926(b), in which case the EPA must hold a public hearing and give the state a reasonable period of time to correct the alleged deficiencies. See § 6926(e). Section 6928(a)(1) and (2) provides that the EPA may bring a civil action of its own against any person determined to be in violation of the law, provided only that if the violation has occurred in a state authorized to implement and enforce a hazardous waste program, the EPA must notify the state before bringing the action.

In the court of appeals' view, the plain language of the act revealed "a congressional intent for an authorized state program [such as Missouri's] to supplant the federal hazardous waste program in all respects including enforcement." *Harmon Industries,* 191 F.3d at 899. The court found that because the language of the act was clear, there was no reason to defer to the EPA's interpretation that it had inde-

pendent enforcement authority under the act. The court acknowledged that the phrase "in lieu of" could be read as referring only to the programs that are to be enforced in a particular state rather than who is responsible for enforcement of the regulations, *see id.* at 898, and that the phrase refers to the program itself, *see id.* at 899. However, it found that an examination of the statute as a whole supported the interpretation that the EPA is barred from acting unless a state failed to take any enforcement action and then only after providing written notice to the state or, alternatively, withdrawing its authorization to the state to act in its stead. *See id.* In the court's view, "the administration and enforcement of the program are inexorably intertwined." *Id.* The provisions in § 6928 authorizing the EPA to bring enforcement actions when read together with § 6926(b)'s provision that the EPA may withdraw state authorization if it finds the state's enforcement is inadequate only reinforced "the primacy of the state's enforcement rights under [the act]." *Id.*

The court added that the legislative history supported the view that the EPA could not act except in limited circumstances not present in the *Harmon Industries* case. *See id.* at 901. The House Report stated that the states were to have primary enforcement authority, *see* H.R. Rep. 1491, 94th Cong., 2nd Sess. 24, *reprinted in* 1976 U.S.C.C.A.N. 6262, and that the legislation permitted the states to take the lead but that the EPA was not "prohibited from acting in those cases where the state fails to act, or from withdrawing approval of the state hazardous waste plan and implementing the federal hazardous waste program pursuant" to the act. *Id.* at 6269. The court concluded that it found "no support either in the text of the statute or the legislative history for the proposition that the EPA is allowed to duplicate a state's enforcement authority

with its own enforcement action." *Harmon Industries,* 191 F.3d at 901.

With respect, I find the Eighth Circuit's reading of the Resource Conservation act unpersuasive. I disagree with the conclusion that giving the states authority to implement and enforce the hazardous waste program gives the states the sole right of enforcement under the act unless the EPA withdraws a state's authorization or the state fails to take any enforcement action. I believe that the court read too much into the phrases "in lieu of" and "same force and effect" and at the same time gave inadequate effect to the provisions in the statute that demonstrate Congress's intent to give the EPA its own independent enforcement authority even in states that have authorized hazardous waste programs. *See* § 6928(a)(1) and (2).

Although no other appellate court has addressed overfiling under the Resource Conservation act, a district court in the District of Colorado has done so in a recent persuasive decision. *See United States v. Power Engineering Co.,* 125 F.Supp.2d 1050 (D.Colo.2000). The district court concluded, as I do, that the *Harmon Industries* decision rested on a flawed interpretation of the act and in particular, a mistaken reading of the "in lieu of" language in § 6926(b) as " 'reveal[ing] a congressional intent for an authorized state program to supplant the federal hazardous waste program in all respects, including enforcement.' " *Id.* at 1059 (quoting *Harmon Industries,* 191 F.3d at 899). The court added that the Eighth Circuit's "harmonization" of §§ 6926(b) and 6928(a) (which provides that the EPA retains the power to address violations occurring in authorized states) rests on the unsupportable reading of § 6926(b) as reflecting a congressional intent that authorized states would supplant the federal hazardous waste program in all respects. *See id.* In fact, the structure of

the statute suggests that the administration and enforcement of state regulations are not " 'inextricably intertwined,' " as shown by the separate provisions for state enforcement and administration in § 6926 and for federal enforcement of the regulations in § 6928. *See id.*

Although the court of appeals gave weight to the term "in lieu of," it is used only in the first of two independent clauses of the sentences in which it appears and not in the second, independent clause that refers to the issuance and enforcement of permits for storage, treatment and disposal of hazardous waste, not to the entire program. As the district court noted in *Power Engineering,* 125 F.Supp.2d at 1059, the second clause would be superfluous if Congress had intended the state program to supplant the federal program in all respects including enforcement. In that circumstance, there would have been no necessity to provide for enforcement authority over permits. *See id.*

The phrase, "same force and effect" appears under the heading, "Effect of State permit," implicitly limiting it to permits and indicating only that state-licensed permits will have the same force and effect as federal permits. In *Harmon Industries,* the court of appeals determined that the heading was of no moment: "Regardless of the title or heading, the plain language of section 6926(d) states that '[a]ny action taken by a State under a hazardous waste program authorized under this section shall have the same force and effect as action taken by the [EPA] under this subchapter.' " *Harmon Industries,* 191 F.3d at 900. This disregard for the heading undermines the court's conclusion. Statutes are to be read to give effect to every word, wherever possible. Disregarding a title runs the risk of missing the meaning of the statute. The court justified its decision to ignore the title by saying that it

found it incongruous to think that the act authorizes states to implement and administer a hazardous waste program in lieu of the federal program "where only the issuance of permits is accorded the same force and effect as an action taken by the federal government." *Id.* In fact, the result is not incongruous. Knowing the significance of permits in the hazardous waste program, Congress intended to give certainty to permit holders that if they complied with the terms of their state-issued permits they would not be prosecuted by either the state or the federal government.

■ The Eighth Circuit found that the Resource Conservation act is not ambiguous on the subject of state and federal prosecutions. I agree with the conclusion that the act is unambiguous. However, my reading of the act is that it authorizes the federal government to bring enforcement actions in states authorized to implement and enforce the hazardous waste program, provided only that notice is given to the state. This difference in interpretation of the plain language does not mean that the statute is ambiguous, *see Moskal v. United States,* 498 U.S. 103, 108, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990) (division of judicial authority over meaning of statute is not automatically sufficient to show statute is ambiguous so as to trigger policy of lenity); *Jones v. Brown,* 41 F.3d 634, 639 (Fed.Cir.1994), so that resort to either legislative history or agency interpretation is necessary. If such resort were necessary, however, I would not read the legislative history as supporting the view that no federal enforcement action could be taken in an authorized state short of withdrawing a state's authorization. Nothing in the history suggests that Congress intended such a result. Rather, I would defer to the agency's interpretation of the law as representing a reasonable interpretation of an ambiguous statute. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). As demonstrated by its filing of this suit, the agency reads the law as permitting independent actions by different sovereigns.

Defendant's motion for partial summary judgment on its affirmative defense of preclusion will be denied.

2. *Merits of Resource Conservation and Recovery Act claims 14–21*

■ In claims 14–21, plaintiff alleges that defendant violated requirements of the Resource Conservation act relating to the accumulation of hazardous wastes (claims 14, 15 and 21), record keeping (claims 16–18) and emergency preparedness and prevention (claims 19 and 20). At a status conference held on May 11, 2001, plaintiff's counsel advised the court and defendant's counsel that plaintiff would not be pursuing claims 16, 19, 20 and 21 and only a portion of claim 15. This leaves only claims 14, part of 15 and 17 and 18.

a. Claim 14—failing to label hazardous waste on May 29, 1998

Claim 14 rests on Linda TeKrony's observation of two brown bottles in defendant's laboratory that were unlabeled and, in one instance, open, and that were being used to collect hazardous waste. Defendant argues that plaintiff cannot prove that the bottles violated Wis. Admin. Code § NR 615.05(4)(c)5, part of the federal authorized hazardous waste management program for the state of Wisconsin, for two reasons. (1) The bottles TeKrony observed did not contain wastes that had been "generated" within the meaning of the Resource Conservation act; rather, they were an integral part of the laboratory operations. One bottle was being used as a collection bottle for running viscosity tests; the other was used for collecting various fluids utilized in several test proce-

dures. The contents of the bottles were emptied into labeled hazardous waste containers at the end of each shift and only then could they be said to be generated as waste. (2) The government cannot show that the bottles contained any listed hazardous waste.

Neither of defendant's arguments has any substance. Defendant does not have any admissible evidence that the bottles in question were used for any purpose other than the temporary storage of hazardous waste. Merely saying that the bottles were the final step or the end point in a process does not convert the bottles into an active part of an investigative process. Indeed, it suggests just the opposite: the contents were the waste generated after the various laboratory processes had been completed. It is telling that the bottles are emptied directly into larger waste containers at the end of each shift. This is strong evidence that they were temporary containers of waste.

■ Arguing that plaintiff cannot prove that the bottles contained hazardous waste ignores the undisputed evidence that defendant's own employees directed TeKrony to the bottles in response to her request to see the area in the laboratory where laboratory hazardous waste was generated and accumulated. That response constitutes an admission by knowledgeable people that the bottles contained hazardous waste.

Section NR 615.05(4)(c)5 provides an exception from Resource Conservation act permitting requirements for generators that accumulate up to 55 gallons of hazardous waste at or near any point where hazardous waste is generated and accumulated initially if the container holding the hazardous waste is always kept closed except when it is necessary to add or remove waste and the containers are marked with the words "hazardous waste" or other words that identify their contents. It is undisputed that defendant's brown bottles did not comply with these simple requirements. Therefore, I conclude that plaintiff is entitled to partial summary judgment on this claim.

b. Claim 15: failing to secure hazardous waste containers in May 1998

Plaintiff has advised the court and opposing counsel that it will pursue only part of this claim but has not identified which portion it will pursue and which it will abandon. Therefore, I will leave this claim unaddressed at this time.

c. Claim 17: failing to keep records

■ Claim 17 is directed to defendant's alleged failure to maintain records showing the results of weekly inspections of hazardous waste in the less–than–90–day hazardous waste accumulation area at the refinery. Under the Resource Conservation act, owners, operators and generators are required to conduct weekly inspections of areas on site where they store containers holding hazardous waste and look for leaks and deterioration. *See* Wis. Admin. Code § NR 615.05(4)(a)2.b. Subsection c of this regulation requires that such persons maintain records of the weekly inspections for three years.

When TeKrony reviewed defendant's records, she found that seven reports were missing. Defendant does not deny that the reports were missing; indeed, in its brief in opposition to plaintiff's motion for partial summary judgment, it ignores this claim completely. I conclude, therefore, that plaintiff is entitled to partial summary judgment on claim 17.

d. Claim 18: failing to submit land disposal restriction notices

Defendant does not deny that records were missing. It argues that the missing records are of no consequence, particularly

because it was able to secure records from the disposal sites that corroborated that defendant had filled out the land disposal restriction notices and hazardous waste manifests. Moreover, defendant asserts, this claim involves no allegations of improper handling of the wastes. Nothing in defendant's brief convinces me that it can contest liability for the violations alleged in claim 18. It will have a full opportunity at the damages phase of the trial to argue the propriety of imposing any penalty for the violations and the amount of penalty, if any.

### D. *Emergency Planning and Community Right–to–Know Act (Claims 22–24)*

■ In claims 22–24, plaintiff alleges that defendant reported its tank air emissions improperly as fugitive releases for certain toxic chemicals and failed to report any air emissions for its storage tank as stack releases for those same chemicals (claim 22), that in 1994, 1995 and 1996, defendant violated the requirement of preparing and retaining its threshold calculations for three years for certain chemicals (claim 23) and that it did not have its threshold calculations for certain chemicals in support of its 1994, 1995 and 1996 EPA Form R reports readily available for EPA inspection.

Pursuant to the Emergency Planning and Community Right–to–Know Act, 42 U.S.C. § 11048, plaintiff has promulgated regulations establishing standards under which facilities must report information relating to the release of toxic chemicals. *See* 40 C.F.R. Part 372. This information is used to facilitate emergency planning and public monitoring. Under 42 U.S.C. § 11023(c), owners or operators of a facility are required to complete toxic chemical release forms (Form R reports) for each toxic chemical listed under 40 C.F.R. § 372.65 that was manufactured, processed or otherwise used during the preceding year in quantities exceeding the toxic chemical threshold established under 42 U.S.C. § 11023(f). On the Form R report, facilities are required to document the annual quantity of each toxic chemical entering the environment, among other information. *See* 42 U.S.C. § 11023(g)(1)(C)(iv). Owners and operators must submit completed Form R's to the Environmental Protection Agency and to the state and retain the records at their facility where they are to remain available for inspection by plaintiff.

#### 1. *Claim 22*

In completing the toxic chemical release form, defendant was required to estimate the total releases of each toxic chemical into the environment in pounds per year from the facility and to provide an indication of the basis of its estimate for fugitive (or non-point) and stack (or point) air emissions.

The 1994 Form R report instructions regarding stack air emissions provide:

> Report the total of all releases of the toxic chemical to the air that occur through stacks, vents, ducts, pipes or other confined air streams. *You must include storage tank emissions.* Air releases from pollution control equipment would generally fall in this category. Monitoring data, engineering estimates, and mass balance calculations may help you to complete this section.

Toxic Chemical Release Inventory Reporting Form R and Instructions, Revised 1994 Version. Identical instructions were included in the 1995 and 1996 Emergency Planning act reporting packages. According to plaintiff, this language establishes that the storage tank emissions should have been reported as "stack" releases and not as "fugitive" ones.

Defendant asserts that the emissions from its storage tanks fit the generally

accepted definition of fugitive, not stack, emissions. It points to the design of its storage tanks where residue of the tank contents remains on the wall of the tank after the roof is lowered. In support of its contention that it was proper to report the storage tank emissions as fugitive, defendant relies on an informational document produced by the Environmental Protection Agency for the proposition that the agency contemplates facilities categorizing emissions as either fugitive or stack depending on the circumstances. That document reads as follows:

> Storage Tanks, Point Source Air Emissions, Fugitive Air Emissions
>
> **387. Why are *releases* from storage tanks considered point source air emissions for Section 313 reporting while *releases* from similar operations (*i.e.,* tank trucks and railcars) are considered fugitive emissions?**
>
> Storage tanks and railcars or tank trucks are similar operations. However, it is the nature of *releases* rather than their source that is most important in their classification for reporting. Because emissions from railcars and tank trucks are most often small, scattered, and the result of manual transfer operations, they are considered fugitive. Emissions from storage tanks, meanwhile, are most often considered point source because they are usually from vents, ducts, or other confined air streams. *If a facility has sufficient reason to believe that the nature of releases from rail cars and tank trucks are similar to those of storage tanks, they may report them as point source emissions, or vice versa. The facility must, however, document all assumptions and estimates made to support their reasoning.*

EPCRA Section 313 Q & A, at 121 (November 1997) (emphasis in original). Defendant points out that the document acknowledges that a facility may choose to categorize truck emissions as stack releas-

es because they are similar to storage tanks or "vice versa." In addition, the fact that emissions from tank sources are "most often" considered stack emissions because they are "usually" from vents and confined air streams indicates that the releases must at least sometimes be considered fugitive. Defendant draws the conclusion that plaintiff contemplates that storage tank emissions can be categorized as fugitive releases and further, that the Section 313 Q & A document implicitly authorized defendant to categorize the emissions as fugitive.

Despite the strong language of the instructions to Form R, I find the relevant facts relating to this claim to be in dispute. Although it is undisputed that defendant categorized the storage tank emissions as fugitive rather than stack, the parties dispute the character of the majority of the emissions. For example, the undisputed evidence does not establish what percentage of the emissions from the storage tanks escapes through diffuse routes as opposed to through vents and stacks. Although the Q & A document was not produced until November of 1997 and defendant could not have relied on it in 1994, 1995 or 1996, the undisputed facts do not establish whether the document reflects a long-standing view of the Environmental Protection Agency or a change in policy. Accordingly, I will deny plaintiff's motion for summary judgment as to claim 22.

Defendant raises an additional concern relating to claim 22. Defendant contends that plaintiff is seeking to enforce two separate violations stemming from a single reporting decision: reporting stack emissions improperly as fugitive and failing to report stack emissions. Defendant alleges that charging for two separate violations places defendant in a worse position than if it had reported no emissions from its tanks, a result that could not have been

intended by Congress. In response, plaintiff contends that defendant (1) reported the amount of its fugitive releases improperly on its Form R reports and (2) reported those amounts improperly to the public in its Toxic Release Inventory. Although I note the disagreement, I need not resolve the issue at this time.

2. *Claims 23 and 24*

 40 C.F.R. § 372.10 requires facilities to maintain records for a period of three years from the date of the submission of its Form R reports, including "documentation supporting the reports submitted under § 372.30 including: ... (ii) data supporting the determination of whether a threshold under § 372.25 applies for each toxic chemical." 40 C.F.R. § 372.10(a)(3). Defendant argues that plaintiff mischaracterizes the requirements of the provision when it contends that defendant was required to maintain documents supporting the threshold "calculations" rather than "determinations." On the basis of its statement that defendant's inspection consultant Kugle does not recall TeKrony asking to see threshold "calculations" or the back-up documentation for those calculations, defendant seems to be arguing that it provided plaintiff with its Form R report determinations but not necessarily its underlying calculations. Defendant asserts that if the Environmental Protection Agency inspector had asked for the underlying calculations, defendant had the documents readily available and would have provided them; its data supporting threshold determinations is kept on file at the refinery for reporting years 1992 through the present in both computer and hard copy format.

In response, plaintiff asserts that in the industry and within the regulatory community, "calculation" and "determination" are synonyms because some form of calculation is required to determine whether a toxic chemical threshold has been exceeded. Plaintiff points to the fact that defen-

dant labeled a section of its Form R documents as "Threshold Calculations and Chemical Inventory." In addition, plaintiff alleges that inspector TeKrony told the refinery manager that she would review threshold calculations after the inspection if defendant could produce them, but she never received any additional documentation.

In addition to the debate over the meaning of the terms determination and calculation, the facts surrounding which forms defendant prepared and maintained in order to make its threshold determinations and whether those forms were available for review are disputed. Accordingly, plaintiff's motion for summary judgment as to claims 23 and 24 will be denied.

### ORDER

IT IS ORDERED that

1. The motion for partial summary judgment of Defendant Murphy Oil USA, Inc.

a. on its affirmative defense that plaintiff's first three claims for legal and equitable relief are barred by the statute of limitations is DENIED;

b. on its affirmative defense that plaintiff's first four claims for relief are barred by defendant's settlement of a suit against it brought by the state in 1992 is DENIED;

c. on its affirmative defense that defendant's compliance with its air permit precludes any enforcement action by plaintiff is DENIED;

d. on its affirmative defense that its sulfur recovery unit is a pollution control device that is not subject to Prevention of Significant Deterioration requirements is DENIED;

e. on its affirmative defense that plaintiff is barred from prosecuting its first four claims because it did not exhaust

administrative duties that were available to it is DENIED;

f. on its affirmative defense that plaintiff cannot pursue its first three and its fifth claim against defendant because there were no enforceable statutes in effect at the time the violations are alleged to have occurred is DENIED with one exception; defendant's motion is GRANTED on the claims brought under Wis. Admin. Code Ch. NR 405 and § NR 406.03 in plaintiff's first, second and third claims for relief;

g. on its affirmative defense that plaintiff cannot pursue its first three claims against defendant because Wis. Stat. § 285.81(4) prohibits such an action is DENIED;

h. on its affirmative defense that plaintiff has no basis on which to pursue its first three claims because it improperly compared pre-improvement and post-improvement emissions is DENIED;

i. on its affirmative defense that its sulfur recovery unit is not subject to New Source Performance Standards is DENIED;

j. on its affirmative defense that plaintiff cannot prosecute claims seven and eight against defendant for violation of its National Pollutant Discharge Elimination System permit because the permit was not in force at the time of the alleged violations is DENIED;

k. on its affirmative defense that plaintiff cannot bring a prosecution against defendant under the Resource Conservation and Recovery Act because the state has filed its own action against defendant under that act and the act forbids independent actions by both the state and federal government is DENIED.

2. The motion for partial summary judgment of plaintiff United States of America

a. on Clean Air Act claims one through five is DENIED;

b. on Clean Air Act claim six is GRANTED;

c. on Clean Water Act claims seven, eight and nine is GRANTED;

d. on Resource Conservation and Recovery Act claims fourteen, seventeen and eighteen is GRANTED;

e. on Emergency Planning and Community Right–to–Know Act claims twenty-two through twenty-four is DENIED.

3. A ruling is reserved on plaintiff's motion for partial summary judgment on Resource Conservation and Recovery act claim fifteen.

4. Plaintiff's Resource Conservation and Recovery Act claims sixteen, nineteen, twenty and twenty-one are WITHDRAWN.